UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

PAUL D. CEGLIA,

                                        Plaintiff,

        v.

**ERIC HIMPTON HOLDER, JR.,** individually
and as Attorney General of the United States,
**PREETINDER S. BHARARA,** individually          Civil Action No.:
and as *US Attorney for the Southern District*
*of New York,* **JANIS M. ECHENBERG**
and **CHRISTOPHER D. FRYE,** individually
and in their capacity as representatives of the US
Attorney's Office for the Southern District of New
York

                                        Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF THE TRO

**Counsel and Local Counsel for Plaintiff**
Robert Ross Fogg, Esq.
ROBERT ROSS FOGG, ESQ.
69 Delaware Avenue, Suite 600
Buffalo, New York 14202
Tel: (716) 853-3644  Fax: (716) 852-6782
rrfogg711@roadrunner.com

**Co-Counsel for Plaintiff**
Paul Argentieri, Esq.
PAUL ARGENTIERI & ASSOCIATES
188 Main Street
Hornell, New York 14843
Tel: (607) 324-3232 Fax: (607) 324-6188
paul.argentieri@gmail.com

**March 7, 2013**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

JURISDICTION AND VENUE ......................................................................3

BACKGROUND ..........................................................................................4

AUTHORITY ...............................................................................................7

ARGUMENT

      RIGHT TO ACCESS THE COURT IS
      PROTECTED BY FIRST AMENDMENT ...........................................12

      BASIS FOR INJUNCTION.................................................................18

            a.) Likelihood of Success...........................................................18

            b.) Irreparable Harm..................................................................24

            c.) Balance of Equities ..............................................................26

            d.) Public Interest ....................................................................27

CONCLUSION..............................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*AAR-ZEE SERVS., INC. v. QUANTUM ACQUISITION PARTNERS, LLC,*
   2011 NY Slip Op 32183 - NY: Supreme Court 2011 ...................................................17

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.,*
   263 F.3d 239 (3d Cir. 2001)..............................................................................14

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
   486 U.S. 492, 499, 100 L. Ed. 2d 497, 108 S. Ct. 1931 (1988).........................................14

*BE&K CONSTR. CO. v. NLRB,*
   536 US 516 - Supreme Court 2002.................................................................12, 13, 16

*Berger v. United States,*
   295 US 78 - Supreme Court 1935....................................................................26

*Bill Johnson's Restaurants, Inc. v. NLRB,*
   461 US 731 - Supreme Court 1983....................................................................12

*Brewer v. West Irondequoit Cent. School Dist.,*
   212 F. 3d 738 - Court of Appeals, 2nd Circuit 2000 ....................................................24

*Broadrick v. Oklahoma,*
   413 US 601 - Supreme Court 1973....................................................................22

*Bronston v. United States,*
   409 US 352 - Supreme Court 1973....................................................................28

*California Motor Transport Co. v. Trucking Unlimited,*
   404 U.S. 508 – Supreme Court 1972 ..................................................................14

Chambers v. Baltimore & Ohio R. Co.,
   207 US 142 - Supreme Court 1907....................................................................12

*Cheminor Drugs, Ltd. v. Ethyl Corp.,*
   168 F.3d 119 – Court of Appeals, 3rd Circuit 1999 ....................................................14

Chevron USA Inc. v. Natural Resources Defense Council, Inc.,
   467 US 837 - Supreme Court 1984....................................................................19

*Christoforu v. US,*
   842 F. Supp. 1453 - Dist. Court, SD Florida 1994 ....................................................10

*Citigroup Global Markets, Inc. v. VCG SPECIAL OPPORT. MASTER,*
   598 F. 3d 30 - Court of Appeals, 2nd Circuit 2010 .................................................18, 22

*Cityfed Financial v. Office of Thrift Supervision,*
   58 F. 3d 738 - Court of Appeals, Dist. of Columbia Circuit 1995 ................................18

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
   499 U.S. 365, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)............................................15

*Clarke v. Office of Fed. House. Enter. Oversight,*
   355 F. Supp. 2d 56, 66 (D.D.C. 2004) ........................................................................27

*Dombrowski v. Pfister,*
   380 US 479 - Supreme Court 1965.........................................................7, 8, 23, 25, 27

*DSE, Inc. v. United States,*
   3 F. Supp. 2d 1464, 1472 (D.D.C. 1998) .....................................................................26

*Eastern R. Conf. v. Noerr Motors,*
   365 US 127 - Supreme Court 1961.........................................................................13, 20

*Elrod v. Burns,*
   427 US 347 - Supreme Court 1976................................................................................24

*Fenner v. Boykin,*
   271 US 240 - Supreme Court 1926..................................................................................9

*International Long Term Care v. Shalala,*
   947 F. Supp. 15 (D.D.C. 1996) .....................................................................................26

*Juluke v. Hodel,*
   811 F. 2d 1553 - Court of Appeals, Dist. of Columbia Circuit 1987............................10

*Majuri v. United States,*
   431 F. 2d 469 - Court of Appeals, 3rd Circuit 1970.......................................................7

*McDonald v. Smith,*
   472 US 479 - Supreme Court 1985 ..............................................................................12

*Members of City Council of Los Angeles v. Taxpayers for Vincent,*
   466 US 789 - Supreme Court 1984................................................................................22

*Mine Workers v. Illinois Bar Assn.,*
   389 US 217 - Supreme Court 1967.....................................................................7, 13, 14

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060, 1066 (D.C. Cir.1998)..........................................................................27

*NAACP v. Button,*
    371 US 415 - Supreme Court 1963...........................................................8, 9, 23, 27, 29

*Nat'l Treasury Employees Union v. U.S. Dep't of Treasury,*
    838 F. Supp. 631, 640 (D.D.C. 1993)............................................................................26

*New York v. Ferber,*
    458 US 747 - Supreme Court 1982................................................................................22

*Nobby Lobby, Inc. v. City of Dallas,*
    970 F.2d 82, 93 (5th Cir. 1992) ...................................................................................27

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49, 56, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993).......................................14

*Rendelman v. State,*
    927 A. 2d 468 - Md: Court of Special Appeals 2007 ...................................................13

*Roth v. United States,*
    354 US 476 - Supreme Court 1957................................................................................24

*Sosa v. DirecTV, Inc.,*
    437 F. 3d 923 - Court of Appeals, 9th Circuit 2006 .........................................14, 15, 16

*Thomas v. Collins,*
    323 US 516 - Supreme Court 1945..........................................................................12, 13

*US v. Butler,*
    351 F. Supp. 2d 121 - Dist. Court, SD New York 2004 ...............................................21

*US v. Horvath,*
    492 F. 3d 1075 - Court of Appeals, 9th Circuit 2007 ...................................................20

*US v. Masterpol,*
    940 F. 2d 760 - Court of Appeals, 2nd Circuit 1991 ....................................................21

*US v. Vreeland,*
    684 F. 3d 653 - Court of Appeals, 6th Circuit 2012 .....................................................20

*US v. Williams,*
    128 S. Ct. 1830 - Supreme Court 2008.........................................................................23

*Virginia v. Black,*
    538U.S. 343, 155 L. Ed. 2d 535, 123 S. Ct. 1536 (2003)............................................22

*West Virginia Conservancy v. Island Creek Coal Co.,*
    441 F.2d 232 (1971)....................................................................................................19

*Winter v. Natural Resources Defense Council, Inc.,*
    129 S. Ct. 365 - Supreme Court 2008....................................................................18, 22

*Younger v. Harris,*
    401 US 37 - Supreme Court 1971................................................................................10

## Statutes and Rules

U.S. Constitution, Amendment I.................................................................................12, 20

## Other Authorities

*Man Claiming Facebook Ownership Arrested on Fraud Charges*
    Dealbook, October 26, 2012 ..........................................................................................5

## PRELIMINARY STATEMENT

Plaintiff respectfully requests that this Court grant Plaintiff's motion for injunctive and declaratory relief to enjoin any and all future criminal prosecutions arising out of the Civil Case relative to drafting, filing and serving pleadings, motions, demands, objections, reports, evidence, etc., and the use of the same, whether oral or written, to protect Plaintiff's fundamental Constitutional right, which is enumerated in the Bill of Rights.

In addition, Plaintiff, Paul D. Ceglia, respectfully requests this Court to grant Plaintiff's motion for injunctive and declaratory relief to enjoin the pending federal criminal prosecution, commenced November 26, 2012, in the United States District Court for the Southern District of New York, under *United States of America v. Paul D. Ceglia,* indictment case number 1:12-cr-00876-ALC (hereinafter referred to as the "Criminal Case") (see, Indictment, attached as Exhibit A), the genesis of which is Plaintiff's conduct in filing and serving initial pleadings pertaining to a pending federal civil litigation, commenced July 7, 2010, in the United States District Court for the Western District of New York, under *Ceglia v. Zuckerberg et al,* case number 1:10-cv-00569-RJA-LGF (hereinafter referred to as the "Civil Case").

The Plaintiff asserts that the US Attorney for the SDNY believes that every filing Plaintiff makes in the Civil Case is another indictable crime. This assertion is supported by the direct threats made by the Government in their response to Plaintiff's change of venue motion. (See, Government's Memorandum of Law in Opposition to Defendant Ceglia's Motion to Transfer Venue, Case: 1:12-cr-00876-ALC, Document #21, page 11- 12, attached as Exhibit B).

The Government's continuing and ongoing unconstitutional threats of prosecution, based solely upon civil litigation pleading activities, deprives Plaintiff of his First Amendment right and must cease immediately.

At present, Plaintiff, by virtue of the Criminal Case, is court ordered to live under home detention with a GPS ankle bracelet.  Additionally, Plaintiff lives under the constant daily threat of further prosecution in the Criminal Case, fear of possible revocation of bail and the filing of additional federal criminal charges brought against him simply for proceeding on with and actively prosecuting the Civil Case.  Thus, the grant of Plaintiff's motion for a TRO is essential.

Accordingly, Plaintiff prays for the relief as stated herein and in all papers and attachments submitted hereto.

## JURISDICTION AND VENUE

The district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws or treaties of the United States. Jurisdiction is conferred on this Court by Title

28 U.S. Code § 1331.

Venue is proper in this district under 28 U.S.C. §§ 1391. Plaintiff, Paul D. Ceglia,

resides at 2558 Hanover Hill Road, Wellsville, NY, within the jurisdiction of this Court.

## BACKGROUND

In June 2010, Plaintiff initiated a lawsuit against Mark Zuckerberg and Facebook, Inc. (the "Civil Defendants") in the Supreme Court for the State of New York, Allegany County (the "Civil Case"). Upon the Civil Defendants' motion, the case was subsequently removed to the U.S. District Court for the Western District of New York ("WDNY"). (See, *Ceglia v. Zuckerberg*, et al., 1:10-CV-00569-RJA-LGF).

Plaintiff was arrested on October 26, 2012, pursuant to a criminal complaint filed in the Southern District of New York ("SDNY"). A grand jury sitting in the SDNY returned Indictment 1:12-CR-00876-ALC (the "Indictment," attached as Exhibit A) on November 26, 2012, charging the Defendant with one count of mail fraud and one count of wire fraud. The statutory allegations of mail fraud in the Indictment state, "to wit, Ceglia filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused legal pleadings and other items to be delivered by mail to Washington, D.C., among other places, from the Southern District of New York and elsewhere, including on or about April 11, 2011 (*the filing date of Plaintiff's amended civil complaint*)." (See, Indictment, attached as Exhibit A).

The statutory allegations of wire fraud in the Indictment substantially mirror the mail fraud allegations, alleging, "to wit, Ceglia filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused others to send interstate electronic communications in connection with that lawsuit, including on or about July 14, 2011, November

1, 2011 and December 8, 2011 (*the dates of Plaintiff's electronic filings of submissions on the pending Civil Case*)." (See, Indictment, attached as Exhibit A).

The Indictment brought in the SDNY makes no other allegations other than that Plaintiff filed Civil Case in the WDNY. The Defendants accused Plaintiff of "Dressing up a fraud as a lawsuit[1]". (See, Dealbook.nytimes.com Article, Man Claiming Facebook Ownership Arrested On Fraud Charges, Attached as Exhibit C).

In the government's response in opposition to Plaintiff's motion to change venue, the government clarified their position that every filing made in Civil Case is subject to persecution on the same charges brought in the Indictment. "Not only did the ongoing fraud <u>continue</u> in Manhattan when Ceglia's New York City-based attorneys served certain legal documents, including the amended complaint, on the Civil Defendant's counsel in, among other places, Washington, D.C., but each and every affirmative act in furtherance of the ongoing fraud was <u>completed</u> in New York when, among other things, counsel for the Civil Defendants were served by Ceglia's attorneys with the various legal documents that he has employed to further his fraudulent scheme to defraud California-based Zuckerberg and Facebook, Inc." (See, Government's Memorandum of Law in Opposition to Defendant Ceglia's Motion to Transfer Venue, Case: 1:12-cr-00876-ALC, Document #21, page 11- 12, attached as Exhibit B).

Interesting to note, the two lead partners from Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), the law firm representing the Civil Defendants, were both former federal prosecutors in the SDNY. Further, prior to his current presidential appointment as US Attorney for the SDNY,

---

[1] http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/

Mr. Preetinder Bharara, was an associate attorney employed by the Civil Defendant's law firm, Gibson Dunn.

The Defendant's affirmation contained in their criminal responsive pleadings make clear that Defendants position is that every time their former colleagues from the SDNY US Attorneys Office, now the lead Defense counsel for Civil Defendants in the ongoing Civil Case, receive an email from the Court, or from Plaintiff's attorneys directly, that it is an affirmative act in furtherance of "an ongoing fraud." In fact, this constitutionally protected right cannot be a fraud as it is nothing more than the exercising his First Amendment right to petition the government for a redress of grievances. Plaintiff, therefore, is immune from prosecution.

## AUTHORITY

This Court has the authority to enjoin an ongoing or threatened criminal prosecution. Though Courts normally refrain from enjoining ongoing criminal prosecutions as "[i]t is generally to be assumed that... prosecutors will observe constitutional limitations as expounded by this Court." (See, *Dombrowski v. Pfister*, 380 US 479 (1965). This typical common sense hesitation is the general rule.

However, the exception to this rule, as in the case at bar, is an encroachment upon First Amendment freedoms. "[A]ctivities protected by the first amendment are a common basis for injunctive relief against actual or threatened criminal prosecution." (See, *Majuri v. United States*, 431 F. 2d 469 (3d Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970)). Use of an injunction ensures immediate relief from deprivation of Constitutional rights. "The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." (See, *Mine Workers v. Illinois Bar Assn.,* 389 U.S. 217, *88 S.Ct. 353, 19 L.Ed.2d 426 (1967))*.

The Supreme Court addressed this critical need for intervention directly. Discussing a statute that the Court found unacceptably vague and, as applied, the Court held that the statute violated the First Amendment to the Constitution, just as it does here. The Court reasoned, "[w]hen the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases." (See, *Baggett* v. *Bullitt, supra,* at 379; *Dombrowski v. Pfister*, *supra.*). Plaintiff asserts

that the Government's application of the mail and wire fraud statutes, as alleged in the indictment, demands immediate relief. (See, Indictment, attached as Exhibit A).

An injunction is a critical equitable intervention that serves to restore the injured party's rights and end the deprivation. Without equitable intervention, Plaintiff and an entire class of civil litigants shall be deprived of First Amendment rights. To be sure, the Supreme Court has consistently held that "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure. (See, *NAACP v. Button, supra,* at 432-433; cf. *Baggett* v. *Bullitt, supra,* at 378-379; *Bush* v. *Orleans School Board,* 194 F. Supp. 182, 185, affirmed *sub nom. Tugwell* v. *Bush,* 367 U. S. 907; *Gremillion* v. *United States,* 368 U. S. 11." *Dombrowski v. Pfister,* 380 US 479 (1965)).

The Government's real and immediate threat of arrest is a deterrent that dissuades Plaintiff from continuing to exercise his right to seek redress of a grievance in the Civil Case. The proposition that Plaintiff will have to stand trial and face criminal charges punishable up to twenty years in prison for exercising his enumerated rights in pursuing his civil case goes beyond terrifying and is an outright attempt at tyranny.

Prevailing case law makes clear that Plaintiff should not be required to stand trial for simply exercising his right to sue. "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." (See, *Dombrowski v. Pfister,* supra.).

Plaintiff could not endeavour to speak more clearly than the Court already has. "These [First Amendment rights] are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." (See, *NAACP v. Button*, 371 US 415 (1963)).

It is well settled, equitable intervention is the proper remedy for violations of First Amendment rights. The Supreme Court has made it clear nearly one hundred years ago that "[a] federal injunction was available to prevent state officers from instituting criminal proceedings "under extraordinary circumstances where the danger of irreparable loss [of a constitutional right was] both great and immediate." (See, *Fenner v. Boykin*, 271 US 240 (1926)). Because the right to petition is one of our most precious unalienable rights, it has long since been settled that to flourish, rights need breathing room to survive and thrive. <u>Any</u> unlawful encroachment chills those rights.

The criminal indictment of a Defendant who is also a civil litigant on related issues is an infringement on these rights that cannot be overstated and most surely produces a chilling effect. In the case before the Court, the "chilling effect" is truly a grand understatement. An indictment alone or the separate threat of further prosecution serve not to place Plaintiff's First Amendment rights outdoors on a cool Upstate New York's summer's eve, they serve to freeze them entirely.

The Court should note that historically the hesitation of Federal Courts to intervene in *State* Criminal proceedings has come from concerns over State's rights, Federalism and comity. These concerns vanish when the injunction sought is against a Federal Prosecution. Therefore, the Doctrine of Abstention is not applicable in the case at bar.

Federal Prosecutors have argued and failed, that a wide reading should be given to *Younger v. Harris*, 401 US 37 (1971), the landmark Supreme Court case on the enjoining of state proceedings. They have argued that restraint against injunctions of ongoing criminal proceedings in State Court should be extended to limit the enjoining of ongoing Federal cases. The Court in *Juluke* completely rejected such an argument, stating, "[a]pparently, the Government is seeking to extend the holding of *Younger v. Harris* — that a federal court will not enjoin an ongoing criminal proceeding in state court — to cover the situation in which parallel civil and criminal proceedings take place in federal court. Not only can we find no support for such an extension of *Younger,* but any such extension would be flatly at odds with the prevailing case law." (See, *Juluke v. Hodel*, 811 F. 2d 1553 (1987)).

Other Courts have read *Juluke* just as Plaintiff contends. "Juluke held that the Younger doctrine does not require federal courts to abstain or defer from granting injunctive relief pending resolution of parallel federal criminal actions implicating the First Amendment." (See, *Christoforu v. US*, 842 F. Supp. 1453 (1994)).

Not only does the Court have the authority to enjoin the Defendants in their unconstitutional application of federal statutes that, as applied, violate the Plaintiff's First Amendment right to unfettered access to the Court, the Court has an obligation to do so to uphold justice.

On a daily basis, Plaintiff faces the explicit threat of arrest and incarceration for simply exercising his right to petition by continuing his Civil Case. The government has made it clear that they view every filing made in Civil Case as grounds for prosecution on the same charges brought in the Indictment. The overwhelming oppression must end. In fact, to adhere to

Defendant's flawed logic, Plaintiff could be charged, indicted and arrest merely for the commencement of the instant proceedings.

The Defendants have violated Plaintiff's First Amendment Right with the Indictment and continue to violate his rights daily with the looming threats of further and additional criminal prosecution. Whether intentional or not, the pressure exerted on Plaintiff through the Defendant's constant threat is pressuring Plaintiff to end his Civil Case and relinquish his First Amendment rights to avoid additional criminal prosecution. This Court must embrace a high value on the First Amendment freedoms and must use its authority to protect them by enjoining the current and future related criminal prosecutions of the Plaintiff.

## RIGHT TO ACCESS THE COURT IS
## PROTECTED BY FIRST AMENDMENT

The First Amendment to the Constitution mandates, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (See, *U.S. Constitution*, Amendment I).

Reiterating the mandates of the Bill of Rights, the Supreme Court has held that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." (See, *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 US 731 (1983)). "It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, . . . and therefore are united in the First Article's assurance." (See, *Thomas v. Collins*, 323 U. S. 516, 530 (1945). *McDonald v. Smith*, 472 US 479 (1985)).

Through cases that span nearly one hundred years, the Supreme Court has remained unwavering. In 1907 the Court held, "[t]he right to sue and defend in the courts is the alternative of force. In an organized society, it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship." (See, *Chambers v. Baltimore & Ohio R. Co.*, 207 US 142 (1907)).

In 2002, reaffirming *Chambers* and its progeny, the Supreme Court held, "[w]e have recognized this right to petition as one of "the most precious of the liberties safeguarded by the Bill of Rights" (See, *BE&K Constr. Co. v. NLRB*, 536 US 516 (2002)).

"This liberty was not protected because the forefathers expected its use would always be agreeable to those in authority or that its exercise always would be wise, temperate, or useful to society. As I read their intentions, this liberty was protected because they knew of no other way by which free men could conduct representative democracy." (See, *Thomas v. Collins*, 323 US 516 (1945)).

The right to petition is not dependent upon success. "Nor does the text of the First Amendment speak in terms of successful petitioning—it speaks simply of 'the right of the people . . . to petition the Government for a redress of grievances.'" (See, *BE&K Constr. Co. v. NLRB*, 536 US 516 (2002)).

"A civil action is a lawful means for people to have their private disputes, including financial disputes, decided when they are unable to decide them on their own." (See, *Rendelman v. State*, 927 A. 2d 468 (2007)). "We conclude for the reasons we have discussed that a threat to sue, even if made in bad faith, is not 'wrongful.'" (See, *Id.*). "To criminalize an individual's attempt, such as in this case, to resolve a perceived dispute would only serve to disrupt our system of justice." (See, *Id.*).

### *Noerr-Pennington Immunity*

*Noerr-Pennington* Immunity stems from two United States Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961) and *Mine Workers v. Pennington,* 381 U. S. 657, 669 (1965), combined from which the *Noerr-Pennington* doctrine was established. The Doctrine holds that private entities are immune from liability under the antitrust laws for attempts to influence the passage or enforcement of laws, even if the laws they advocate for would have anticompetitive effects. (See, *Eastern Railroad*

*Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)).

The Doctrine, through the *Noerr-Pennington* progeny, depending on the source, context, and nature of the competitive restraint at issue, extends immunity to valid petitions to all departments of the government for redress whether or not the injuries are caused by the act of petitioning or are caused by government action, which results from the petitioning even if there is an improper purpose or motive. (See, *Noerr, supra*; *Pennington, supra*; *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 100 L. Ed. 2d 497, 108 S. Ct. 1931 (1988); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir.), cert. denied, 528 U.S. 871, 145 L. Ed. 2d 146, 120 S. Ct. 173 (1999)). "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." (See, *Sosa v. DirecTV, Inc.*, 437 F. 3d 923 (9th Cir. 2006).

Since its introduction, the Doctrine has continued to expand beyond the antitrust actions and has been extended to confer immunity from a variety of claims. However, the Doctrine is not without limitation. "[T]he Noerr-Pennington doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." (See, *Sosa, supra.*). "On the other hand, neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." (See, *Id.*).

The "Sham" exception to the Noerr-Pennington doctrine holds that using the petitioning process simply as an anticompetitive tool without legitimately seeking a positive outcome to the petitioning destroys immunity. (See, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)). "Under the *Noerr-Pennington* rule of statutory construction, we must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise." (See, *Id.*).

"*PRE II* recognized the applicability of the first aspect of the breathing space principle when it defined the Noerr-Pennington doctrine's "sham litigation" exception as requiring both objective baselessness and an improper motive." (See, *Sosa, supra,* citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. [PRE II]*, 508 US 49, at 60-61, 113 S.Ct. 1920 (1993), *Emphasis added.*).

Here, the Civil Case at question does not meet the narrow requirements of objective baselessness to be considered "sham litigation." The Civil Case has been ongoing since June 2010, with thousands of pages of expert reports, generated by both sides, detailing the scientific tests performed on the documents in question for determining authentication. Every allegation of fabrication and forgery, relative to the authenticity of the contract and emails, brought forth by the Civil Defendants in their motion to dismiss has been countered by the Plaintiff's world-renowned experts. (See, Dueling Expert Table, attached as Exhibit D). Accordingly, the Court would not have otherwise allowed the case to continue if it was "objectively baseless" or a "sham".

Mindful of its obligation to protect the constitution, the Supreme Court ventured further into ensuring safeguards from cleaver prosecutors alleging that lawsuits are baseless, fraudulent or illegal, by defining lawsuits that lack First Amendment protection clearly and narrowly. "This definition over-protects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution. The *BE&K* case made this "breathing room protection" explicit." (See, *Sosa, supra, emphasis added.*). There is no case law quote that more explicitly exposes the government's outright constitutional violation.

Knowing that some government agencies seemingly know no bounds, the Court added that, "[w]e also held that [the government] may not decide that a suit is baseless by making credibility determinations when genuine issues of material fact...exist." (See, *BE&K Constr. Co. v. NLRB*, 536 US 516 (2002)).

The existence of genuine issues of material fact can be no clearer than in the present case. In April 2003, upon the parties' execution of the contract, which underlies the Civil Case, Plaintiff, Paul D. Ceglia, signed a check made payable to the Civil Defendant for the payment of money in exchange for certain performances by the Civil Defendant. Upon receipt of said check, the Civil Defendant endorsed and presented the draft for payment. The Civil Defendant deposited the executed draft into his bank account, which was duly honored by Plaintiff's bank. The Civil Defendant's bank account was the same banking account that funded the business, which is the subject of the Civil Case. Over the next twelve (12) months, the Parties made multiple subsequent identical transactions for consideration under the contract at issue, each executed by the Civil Defendant and honored by the Plaintiff. The actions of the parties clearly create a strong presumption of merit on Plaintiff's claim.

The Supreme Court of New York in a 2011 case made clear that "[a]n executed check is an instrument for the payment of money only and defenses in the form of impropriety of the underlying contract do not alter its character. An instrument for the payment of money creates a strong presumption of merit on the claims." (See, *AAR-ZEE Servs., Inc. v. Quantum Acquisition Partners, LLC*, 2011 NY Slip Op 32183 (2011)).

Failure to enjoin the US Attorney in this case, would allow all prosecutors, wherever located, to continue to trample First Amendment rights and deny the immunity guaranteed by *Noerr-Pennington*.

## BASIS FOR INJUNCTION

In a 2008 decision, the Supreme Court presented a four prong test, which a Plaintiff must establish. To be successful, "[a] plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." (See, *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. (2008)).

This Four Prong test, however, clearly relies on the Court's discretion and the specifics of the request at hand. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." (See, *Cityfed Financial v. Office of Thrift Supervision*, 58 F. 3d 738 (1995)). In the case at bar, Plaintiff meets all four prongs with overwhelming support.

a.    **Likelihood of Success**

To prevail in a request for injunction, a Plaintiff must demonstrate that there is a likelihood that he will ultimately succeed. This " likelihood" standard has been considered vague by the Second Circuit "the 'likely to succeed on the merits' phrasing [does not] suggest that this factor requires a showing that the movant is 'more likely than not' to succeed on the merits." (See, *Citigroup Global Markets, Inc. v. VCG Special Opport. Master*, 598 F. 3d 30 (2010)).

Other Circuits have interpreted this "likelihood to succeed" standard as more akin to a FRE 12 (b)(6) standard of dismissal. "While we express no opinion on [the merits of the issues],

we can say that their resolution is not immediately apparent. That is enough to say that [the Plaintiff] has not embarked on frivolous litigation, and thus interlocutory relief is not improper if [the Plaintiff] can also show a need for protection which outweighs any probable injury to [the defendant]." (See, *West Virginia Conservancy v. Island Creek Coal Co.*, 441 F.2d 232 (1971)).

The Supreme Court has laid out a standard from which trial courts are to examine statutes that are vague and possibly encroach upon or chill First Amendment rights. The *Chevron* case states that a Court is to determine whether Congress spoke directly to the behavior in its statute." (See, *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837 (1984)).

In the instant case, it is clear that Congress intended to immunize litigants from criminal prosecution while filing civil litigation documents.

### *Chevron Analysis:*

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." (See, *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837 (1984)).

Congress has made no law restricting a citizen's right to petition, nor can it. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (See, *U.S. Constitution*, Amendment I).

"The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." (See, *Eastern R. Conf. v. Noerr Motors*, 365 US 127 (1961)).

Rather, Congress has codified a citizen's right to petition without fear of prosecution. "The legislative history of the judicial function exception indicates that it was enacted by Congress in 1996 and added to § 1001 for the purpose of codify[ing] the judicial function exception which has long been recognized by many Federal courts as necessary to safeguard from the threat of prosecution statements made in the course of adversarial litigation. Allowing the criminal penalties of section 1001 to apply to statements made in the course of adversarial litigation would chill vigorous advocacy, thereby undermining the adversarial process." (See, *US v. Vreeland*, 684 F. 3d 653 (2012)).

The protection afforded under the judicial function exception is not lost when a prosecutor alleges the use of fraudulent documents. "Under 18 U.S.C. § 1001(b), criminal liability does not attach to materially false statements submitted by a party to a judge in a judicial proceeding, even if the party makes the statements knowingly and willfully." (See, *US v. Horvath*, 492 F. 3d 1075 (2007).

"[F]alse statements uttered during the course of court proceedings or contained in court pleadings would not be covered by section 1001." (See, Id. at 4, 1996 U.S.C.C.A.N. 3935, 1996 U.S.C.C.A.N. 3935, 3937-38). The exception, the Report noted, was made sufficiently broad to cover not merely statements, but also "representations, writings or documents" filed in court, since such filings "are already covered by other statutes," such as those prohibiting perjury and obstruction. (See, Id. at 4, 1996 U.S.C.C.A.N. 3935, 1996 U.S.C.C.A.N. 3935, 3938 & n. 6." (See, US v. Butler, 351 F. Supp. 2d 121 (2004), internal quotes added).

"In fact, a well delineated statutory scheme already covers the general area of false statements made during judicial proceedings. Were we to construe section 1001 broadly, we would invite the pyramiding of prosecutions for false representation, 18 U.S.C. § 1001, perjury, 18 U.S.C. § 1621, subornation of perjury, 18 U.S.C. § 1622, false declarations before a grand jury or court, 18 U.S.C. § 1623, obstruction of justice, 18 U.S.C. § 1501 et seq., and contempt, 18 U.S.C. § 401. A rejection of the adjudicative function exception, in other words, could interfere with, if not swallow up, the pre-existing statutory scheme." (See, US v. Masterpol, 940 F. 2d 760 (1991), internal quotes added).

This logic demonstrates Congress' clear intent. Congress, concerned about 18 U.S.C. § 1001 reaching into the Court, codified the judicial function exemption under 18 U.S.C. § 1001(b), to ensure criminal liability would not attach to statements made in the course of adversarial litigation. It cannot be intellectually reconciled or argued in good faith that Congress simultaneously intended and endorsed the premise that the mail and wire fraud statutes could be used to prosecute citizens they specifically immunized from prosecution with 18 U.S.C. § 1001(b).

### *"Likelihood to Succeed" Standard*

In 2010, the Second Circuit, in clarifying the Supreme Court's ruling in *Winters*, stated "Although the Court repeated the "likely to succeed on the merits" phrasing, it did not suggest that this factor requires a showing that the movant is "more likely than not" to succeed on the merits. (See, *Citigroup Global Markets, Inc. v. VCG Special Opport. Master*, 598 F. 3d 30 (2010), citing, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

This key distinction is critical, for it informs the lower Courts that they need not attempt to weigh the request for a preliminary injunction upon a scale similar to that required in adjudicating under the preponderance of the evidence standard, but rather the Court is only to determine if there is simply a "likelihood" to succeed on the merits.

### *Impermissibly Vague*

The First Amendment doctrine of over breadth is an exception to the general rules regarding the standards for facial challenges. (See, *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796, 80 L. Ed. 2d 772, 104 S. Ct. 2118(1984)). The showing that a law punishes a "substantial" amount of protected free speech, "judged in relation to the statute's plainly legitimate sweep," (see, *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973)), suffices to invalidate *all* enforcement of that law, "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." (See, *Id.*, at 613, 37 L Ed 2d 830, 93 S Ct 2908; see also, *Virginia v. Black,* 538U.S. 343, 155 L. Ed. 2d 535, 123 S. Ct. 1536 (2003); *New York v. Ferber* , 458 U.S. 747,769, n. 24, 73 L. Ed. 2d 1113, 102 S. Ct. 3348

(1982); *Dombrowski v. Pfister*, 380 U.S. 479, 491, 14 L. Ed. 2d 22, 85 S. Ct. 1116 (1965)).

A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (See, *US v. Williams*, 128 S. Ct. 1830 (2008)).

"Although ordinarily, '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." (See, *Id.*).

Inherent within this definition of an unconstitutionally vague statute, Plaintiff has satisfied the requirement of a likelihood of success on the merits. In addition, a person of ordinary intelligence cannot divine from the mail and wire fraud statutes that they were intended to criminalize the filing of litigation documents. This vagueness, while permissible in other areas, is inexcusable when it comes to suppressing First Amendment rights.

This likelihood of success is further enforced by the Supreme Court's extensive opinions stating, "[t]he objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." (See, *NAACP v. Button*, 371 US 415 (1963).

First Amendment rights therefore have a special requirement. They are precious rights that require additional measures of protection from areas outside of that arena. "Because First

Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." (See, *Id.*). No argument could realistically be made, nor reasonable inference be fathomed, that the Mail and Wire Fraud statutes, as applied, regulate with the "narrow specificity" required.

The Court must not fail to act, but rather must act with ceaseless vigilance to prevent the Defendants in this case from encroaching upon Plaintiff's First Amendment freedoms. "The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." (See, *Roth v. United States*, 354 US 476 (1957).

As Plaintiff's conduct is protected by an enumerated right in the Bill of Rights, the *Noerr Pennington* Immunity and the Judicial Function Exception, Plaintiff has demonstrated a strong likelihood of success.

    b. **Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (See, *Elrod v. Burns*, 427 US 347 (1976)). The Second Circuit has weighed in on this matter and held that "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" (See, *Brewer v. West Irondequoit Cent. School Dist.*, 212 F. 3d 738 (2000)).

"A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases." (See, *Dombrowski* v. Pfister, *supra*).

Plaintiff has suffered irreparable harm from the effects that the looming threats of continued prosecution have had on his willingness to respond fully in the adversarial Civil Case. Subsequent to commencing his Civil Case and filing court ordered expert reports in preparation of litigation, Plaintiff was arrested, his property seized and liberty substantially interfered. To secure his pre-trial release while the Criminal Case is pending, Plaintiff has had to post a financial bond and continues to endure extreme and drastic restrictions upon his liberty. Moreover, several weeks after Plaintiff was finally released on bail, he was required to respond to the Civil Defendants' dispositive motion to dismiss on statute of limitations and laches grounds. Plaintiff was advised that to respond without hesitancy would have placed Plaintiff at risk of further indictment, including the forfeiture of all the property pledged by him and his parents to secure the property bond required for his bail and criminal pre-trail release.

Given the clarity with which the Supreme Court and the Second Circuit have spoken, Plaintiff has clearly demonstrated that he has sustained irreparable harm from his arrest on unconstitutionally applied mail and wire fraud charges, which will continue until injunctive relief is granted.

### c. **Balance of Equities**

The Defendants will not suffer any harm by the delay for the Courts have long recognized that a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law . . . ." (See, *Berger* v. *United States,* 295 U. S. 78, 88). In the interest of justice then, it is in the prosecutor's interest to ensure that they are not attempting to prosecute a citizen against a Constitutional mandate.

Case law supports issuing an injunction where the only injury to the defendant agency is delay. (See, *International Long Term Care v. Shalala*, 947 F. Supp. 15 (1996) (a delay in administrative process was an inadequate basis for denying a preliminary injunction to stop the Secretary of Health and Human Services from terminating a nursing home's participation in the Medicare program); also see, *DSE, Inc. v. United States*, 3 F. Supp. 2d 1464, 1472 (1998) (issuing an injunction despite resulting delay in performing a government contract); *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (1993)).

In the instant case, the actual and potential injury to Plaintiff is the suppression of his Constitutional rights and ongoing irreparable harm, while the potential injury to the Defendants is simply delay. The balance of equities clearly tips in Plaintiff's favor.

### d. **Public Interest**

Without an injunction stopping the Defendant's egregious violation of Plaintiff's rights, every citizen in America will suffer an equally egregious blow simultaneously. For the reason that "the chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." (See, *Dombrowski* v. Pfister, *supra*).

In the instant case, Plaintiff has retained the most well known and respected document experts in the world, including the former Chief Forensic Scientist of the US Secret Service. Multiple experts have attested to the authenticity of the contract that is central to the Civil Case. The Court in the Civil Case commented that, "from all the plaintiff has put in, it sure looks like they have no intention of throwing the towel in, that their experts are quite competent, if not equally competent or even more competent than your experts." (See, June 30, 2011 Hearing Transcript at page 30, lines 5-9, excerpts attached as Exhibit E).

"These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." (See, *NAACP v. Button, supra*). "It is in the manifest interest of the public that a federal governmental agency be enjoined from acting unlawfully." (See, e.g., *Clarke v. Office of Fed. House. Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) (noting a "substantial public interest" in ensuring that a federal agency "acts within the limits of its authority"); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir.1998) (affirming a preliminary injunction based in part on the public interest in the faithful execution of the laws); *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) (approving the district

court's conclusion that the "public interest is always served when public officials act within the bounds of the law and respect the rights of the citizens they serve.")).

Moreover, the A.B.A.'s Model Code of Professional Responsibility explains the rationale behind Rule 7-105(A), which reads as follows: "The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system."

Congress and the Courts have carefully balanced policy with penalties. "[O]ne consideration of policy overshadowed all others during the years when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying." (See, *Bronston v. United States*, 409 US 352 (1973)). Allowing a prosecutor to use the broad statues of Mail or Wire fraud on an allegation such as Perjury, for example, would disrupt the careful balance currently in place. With it's 20 year maximum penalty, there can be little doubt that quadrupling the penalty would certainly discourage an honest witness from testifying fully and openly.

Failure to enjoin in this action will promote selective prosecutions by providing license to prosecutors to intervene at will, for reasons of their own choosing, in civil actions around the country and bring criminal charges against litigants of their choice. An American litigant should

not have to consider what financial wherewithal and political connections their opponent may have to get them arrested before filing a colorable lawsuit to petition the government for redress of their grievances. The first amendment right to petition would be destroyed out of fear that the petitioner would be prosecuted for "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions. . . ." (See, *NAACP v. Button,* 371 U. S. 415, 433).

The present case draws attention to the Government's ability to cause citizens to undergo irreparable harm, similar to or far reaching as those endured by the Plaintiff, a derivative of which is a chilling effect upon all citizens who seek to exercise their inalienable rights. It is well within in the public's interest for this Court to grant Plaintiff's motion for an injunction.

## CONCLUSION

The First Amendment exegesis is to restrain the government's autocratic actions, which in the present case, have been clearly violated by the Defendants' in their criminal indictment of the Plaintiff. In the case at bar, the purpose of a Court Order enjoining the United States Attorneys from continuing the criminal prosecution of the Plaintiff in the Southern District of New York is to reassure the millions of Americans that the power of the Constitution is organic to every citizen and said rights having been bought and preserved through nearly 250 years by the blood of our citizens.

To deny this application will speak volumes that an adversary's wealth and political access can usurp those rights. The United States Attorney's Office should be reminded that you cannot dress up a lawsuit as a crime without nullifying the First Amendment and should be admonished for their present attempt.

Based upon the aforementioned, Plaintiff has demonstrated: (1) a substantial likelihood of success on the merits; (2) that he has and will suffer irreparable harm in the absence of an injunction; (3) that Defendants cannot show that they would suffer any harm; and (4) the public interest favors an Order for injunction. Therefore, Plaintiff respectfully requests that this Court grant Plaintiff's instant motion.

Dated:    March 7, 2013
          Buffalo, New York

Respectfully submitted,

/s/ Robert Ross Fogg
ROBERT ROSS FOGG, ESQ.
Counsel and Local Counsel for Plaintiff
*PAUL D. CEGLIA*
69 Delaware Avenue, Suite 600
Buffalo, New York 14202
Tele: (716) 853-3644  Fax: (716) 852-6782
Email: rrfogg711@roadrunner.com

Co-Counsel for Plaintiff
Paul Argentieri, Esq.
Paul Argentieri & Associates
188 Main Street
Hornell, New York 14843
Tel: (607) 324-3232 Fax: (607) 324-6188
paul.argentieri@gmail.com

TO:   CLERK OF THE COURT
         United States District Court Clerk's Office
         Western District of New York
         200 United States Courthouse
         2 Niagara Square
         Buffalo, New York 14202
Party-Defendant
         ERIC HIMPTON HOLDER, JR.
         Attorney General of the United States
         U.S. Department of Justice
         950 Pennsylvania Avenue, NW
         Washington, DC 20530-0001
Party-Defendant
         PREETINDER S. BHARARA, US Attorney
         United States Attorney's Office
         Southern District of New York
         1 Saint Andrews Plaza
         New York, New York 10007-1701
Party-Defendant
         JANIS M. ECHENBERG, ESQ., AUSA
         United States Attorney's Office
         Southern District of New York
         1 Saint Andrews Plaza
         New York, New York 10007-1701
Party-Defendant
         CHRISTOPHER D. FRYE, ESQ., AUSA
         United States Attorney's Office
         Southern District of New York
         1 Saint Andrews Plaza
         New York, New York 10007-1701
Courtesy Service
         WILLIAM J. HOCHUL, JR., US Attorney
         United States Attorney's Office
         Western District of New York
         138 Delaware Avenue
         Buffalo, New York 14202

# EXHIBIT A

# EXHIBIT A

## Indictment 1:12-CR-00876-ALC

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 2 6 2012
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -                  :

PAUL CEGLIA,                      :

          Defendant.             :

- - - - - - - - - - - - - - - x

INDICTMENT

## 12 CRIM 876

### COUNT ONE
### (Mail Fraud)

The Grand Jury charges:

### Introduction

1.    At all times relevant to this Indictment, Facebook,

Inc. was, and remains to this day, an Internet corporation that

runs the social networking website, Facebook.   Facebook was

founded by Mark Zuckerberg ("Zuckerberg") together with his

college roommates and fellow Harvard University students,

Eduardo Saverin, Dustin Moskovitz, and Chris Hughes.   Facebook

officially launched at Harvard in the afternoon of on or about

February 4, 2004.   At that time, the website was available on

the Internet at the domain name, "thefacebook.com," but its

membership was limited to Harvard students and only accessible

by those with a Harvard e-mail address.   Over time, the

website's membership expanded to other colleges in the Boston

**JUDGE CARTER**

area, the Ivy League, and Stanford University before it
eventually was made available to anyone aged 13 and over.
As of November 2012, Facebook, Inc. reported that its website
has over one billion active users.

2.    Since in or about July 2004, Mark Zuckerberg has
served as the Chief Executive Officer and a member of the board
of directors of Facebook, Inc.   Beginning in or about January
2012, Zuckerberg also became chairman of the board of directors
of Facebook, Inc.

3.    On or about May 18, 2012, Facebook, Inc. held an
initial public offering.  Mark Zuckerberg's personal interest in
Facebook is presently considered to be worth billions of
dollars.

### The Scheme to Defraud

4.    From at least in or about June 2010, up to and
including in or about October 2012, PAUL CEGLIA, the defendant,
engaged in a multi-billion dollar scheme to defraud Facebook,
Inc. and Mark Zuckerberg and to corrupt the federal judicial
process.

5.    In furtherance of the scheme to defraud, PAUL CEGLIA,
the defendant, doctored or otherwise fraudulently converted a
legitimate contract that he had with Mark Zuckerberg, dated
April 28, 2003 -- in which Zuckerberg agreed to perform certain

2

programming work for CEGLIA wholly unrelated to the Facebook
website, in exchange for an agreed upon fee -- to falsely make
it appear as though he had entered into an agreement with
Zuckerberg in which Zuckerberg agreed to provide CEGLIA with at
least a 50% interest in Facebook.

6.   As a further part of the scheme to defraud, on or
about June 30, 2010, PAUL CEGLIA, the defendant, filed a civil
lawsuit in the Supreme Court for the State of New York, Allegany
County, against Mark Zuckerberg and Facebook, Inc., which was
thereafter removed to the United States District Court for the
Western District of New York, to falsely and fraudulently allege
his ownership interest in Facebook.

7.   As a further part of the scheme to defraud, PAUL
CEGLIA, the defendant, manufactured evidence, including
purported e-mails with Mark Zuckerberg, to support his false and
fraudulent lawsuit and also destroyed evidence that was
inconsistent with that lawsuit's false claim.

### Statutory Allegations

8.   From at least in or about June 2010, up to and
including in or about October 2012, in the Southern District of
New York and elsewhere, PAUL CEGLIA, the defendant, willfully
and knowingly, having devised and intending to devise a scheme
and artifice to defraud, and for obtaining money and property by

means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place and caused to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive and cause to be taken and received therefrom, such matters and things, and did cause to be delivered by mail and such carriers, according to the direction thereon, such matters and things, to wit, CEGLIA filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused legal pleadings and other items to be delivered by mail to Washington, D.C., among other places, from the Southern District of New York and elsewhere, including on or about April 11, 2011.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT TWO
## (Wire Fraud)

The Grand Jury further charges:

9.   The allegations contained in paragraphs 1 through 7 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

4

10.   From at least in or about June 2010, up to and including in or about October 2012, in the Southern District of New York and elsewhere, PAUL CEGLIA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CEGLIA filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused others to send interstate electronic communications in connection with that lawsuit, including on or about July 14, 2011, November 1, 2011, and December 8, 2011.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION AS TO COUNT ONE

11.   As a result of committing the offense alleged in Count One of this Indictment, PAUL CEGLIA, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property constituting or derived from

5

proceeds obtained directly or indirectly as a result of the mail fraud offense alleged in Count One of this Indictment, and any property traceable to such property.

### Substitute Asset Provision

12.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of PAUL CEGLIA, the defendant, up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 1341, and Title 21, United States Code, Section 853.)

6

## FORFEITURE ALLEGATION AS TO COUNT TWO

13.    As a result of committing the offense alleged in
Count Two of this Indictment, PAUL CEGLIA, the defendant, shall
forfeit to the United States, pursuant to Title 18, United
States Code, Section 982(a)(2)(A), any property constituting, or
derived from, proceeds obtained, directly or indirectly, as a
result of the wire fraud offense alleged in Count Two of this
Indictment, and any property traceable to such property.

### Substitute Asset Provision

14.    If any of the above-described forfeitable property, as
a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due
diligence;

    b.    has been transferred or sold to, or deposited
with, a third person;

    c.    has been placed beyond the jurisdiction of the
Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which
cannot be subdivided without difficulty;
it is the intent of the United States, pursuant to Title 18,
United States Code, pursuant to Title 21, United States Code,

7

Section 853(p), to seek forfeiture of any other property of PAUL
CEGLIA, the defendant, up to the value of the above forfeitable
property.

> (Title 18, United States Code, Section 982(a)(2)(A);
> and Title 21, United States Code, Section 853.)

_Kathleen Durick (dy)_
FOREPERSON

_Preet Bharara_
PREET BHARARA
United States Attorney

*B*

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### PAUL CEGLIA,

Defendant.

### INDICTMENT

12 Cr.

(18 U.S.C. §§ 1341, 1343 and 2.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_Kathleen Purcell (deputy)_
Foreperson.

11/26/12   Filed Indictment   Case Assigned To J. Carter.

CATT, USMJ

# EXHIBIT B

# Government's Memorandum of Law in Opposition to Defendant Ceglia's Motion to Transfer Venue

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

       - v. -                                    :                    12 Cr. 876 (ALC)

PAUL CEGLIA,                                      :

               Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CEGLIA'S MOTION TO TRANSFER VENUE


PREET BHARARA
United States Attorney
for the Southern District of New York
Attorney for the United States of America


Janis M. Echenberg
Christopher D. Frey
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PAGE

STATEMENT OF FACTS ................................................................................................. 1

ARGUMENT .................................................................................................................... 4

    A.    Applicable Legal Standards ................................................................... 4

    B.    A Transfer of Venue is Not in the Interest of Justice ................................ 6

        1.    Residence of the Defendant ........................................................ 7

        2.    Location of Witnesses ................................................................ 8

        3.    Location of Events ................................................................... 11

        4.    Location of Relevant Documents and Records ............................. 12

        5.    Disruption of the Defendant's Business ...................................... 12

        6.    Expenses to the Parties ............................................................ 13

        7.    Location of Counsel ................................................................ 15

        8.    Relative Accessibility .............................................................. 15

        9.    Docket Conditions .................................................................. 15

CONCLUSION ............................................................................................. 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

     - v. -             :         12 Cr. 876 (ALC)

PAUL CEGLIA,         :

          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CEGLIA'S MOTION TO TRANSFER VENUE

The Government respectfully submits this memorandum of law in opposition to defendant Paul Ceglia's ("Ceglia" or the "Defendant") motion to transfer venue.

### STATEMENT OF FACTS

The Defendant was arrested on October 26, 2012, pursuant to a criminal complaint (the "Criminal Complaint") filed in this District on October 25, 2012. The Criminal Complaint charged Ceglia with one count of mail fraud and one count of wire fraud in connection with the Defendant's participation in a scheme to defraud Facebook, Inc. and the Chief Executive Officer of that company, Mark Zuckerberg ("Zuckerberg"), and to corrupt the federal judicial process. A grand jury sitting in this District returned Indictment 12 Cr. 876 (ALC) (the "Indictment") on November 26, 2012, charging the Defendant with the same crimes as set forth in the Criminal Complaint.

As alleged by the Government in both the Criminal Complaint and the Indictment, on April 28, 2003, Ceglia entered into a contract with Zuckerberg, then a student at Harvard University, in which Zuckerberg agreed to perform certain programming work for Ceglia and

StreetFax.com, an online business operated by Ceglia that provided pictures and other

information related to street intersections throughout the country to insurance adjusters. (Compl.

at ¶¶ 5, 6b(1)-(2); Ind. at ¶ 5). In the contract they signed in Boston, Massachusetts in April

2003, Ceglia agreed to pay Zuckerberg a fee for his work on the StreetFax.com website.

(Compl. at ¶ 6b(4); Ind. at ¶ 5).

  More than seven years later, in June 2010, Ceglia initiated a lawsuit against Zuckerberg

and Facebook, Inc. (the "Civil Defendants") in the Supreme Court for the State of New York,

Allegany County. Upon the Civil Defendants' motion, the case was subsequently removed to the

U.S. District Court for the Western District of New York. In April 2011, Ceglia filed a 25-page

amended complaint, through his attorneys at the law firm of DLA Piper, LLP in New York, New

York. See Ceglia v. Zuckerberg, et al., 10 Civ. 569 (RJA)(LGF). In his amended complaint, the

Defendant claimed, among other things, that Zuckerberg, in the April 2003 contract, had

promised him at least a 50% interest in "The Face Book" project that ultimately became

Facebook, Inc. In support of his claim, Ceglia attached a copy to his amended complaint of what

he alleged to be the two-page April 28, 2003 contract between himself and Zuckerberg (the

"Alleged Contract"). The first page of the Alleged Contract contained language giving Ceglia "a

half interest (50%) in the software, programming language and business interests" derived from

the expansion of "The Face Book" or "The Page Book." The second page of the Alleged

Contract contained the signatures of Ceglia and Zuckerberg. Also in support of his claim, Ceglia

described and cited e-mails in his amended complaint that he alleged to have exchanged with

Zuckerberg between July 2003 and July 2004 via Zuckerberg's Harvard e-mail account (the

"Purported E-mails"). The Purported E-mails reflect conversations between Ceglia and

Zuckerberg about the design and functionality of "The Face Book" website, as well as ways to

generate income from its expansion. The Purported E-mails also reflect conversations in which

Zuckerberg offered Ceglia money to "repair [their] business relationship." (Compl. at ¶ 6; Ind. at

¶¶ 6-7).

As alleged in the Criminal Complaint and the Indictment, however, Ceglia's claim to

having a contractual right to 50% of Facebook, Inc. is entirely false. Ceglia has doctored or

otherwise manipulated the real contract that he had with Zuckerberg concerning programming

work for StreetFax.com to make it appear as though Zuckerberg had agreed to provide Ceglia

with an interest in Facebook, Inc. Moreover, the Government alleges that Ceglia has doctored,

fabricated and destroyed evidence to support his false claim, including manufacturing the

communications in the Purported E-mails, none of which actually transpired. In using his civil

action to fraudulently demand a significant ownership stake in Facebook, Inc., Ceglia has caused

various legal documents, including motions and declarations, to be transmitted both by mail and

by e-mail from the Southern District of New York, among other places, to counsel for the Civil

Defendants located in, among other places, Washington, D.C. Similarly, at various times,

Ceglia's attorneys located in California and Ohio have transmitted legal documents in

furtherance of the Defendant's fraudulent scheme via e-mail to counsel for the Civil Defendants

in Manhattan, New York. (Compl. at ¶¶ 6-11; Ind. at ¶¶ 6, 8-9).

At various times throughout the pendency of the Defendant's civil action, Ceglia has

been represented by a number of different attorneys, including his current counsel Paul

Argentieri, Esq., who maintains an office in Hornell, New York but now lives in Sebastopol,

California, and Dean Boland, Esq., in Lakewood, Ohio. Additionally, at certain relevant times,

Ceglia was also represented by counsel at DLA Piper, LLP; Kasowitz, Benson, Torres &

Friedman LLP; and Milberg LLP in New York City; as well as Jeffrey Lake, Esq. in San Diego,

California. Finally, during much of the time that Ceglia's civil action has been pending, the

Defendant was living abroad in Ireland, a country to which he had relocated following the filing

of his amended complaint.

On June 2, 2011, counsel for Zuckerberg and Facebook, Inc. moved for expedited

discovery in the civil action pursuant to Federal Rule of Civil Procedure 26(d)(1), seeking,

among other things, immediate production of the original signed version of the Alleged Contract.

By orders dated July 1, 2011, the Honorable Leslie G. Foschio, United States Magistrate Judge

for the Western District of New York ordered the parties in the civil action to engage in limited

expedited discovery, including the gathering of electronic evidence, testing of the Alleged

Contract, and depositions of various expert witnesses located throughout the country who were

retained by both sides. At the close of this discovery period, counsel for Zuckerberg and

Facebook, Inc., filed a motion to dismissed Ceglia's amended complaint, which is still pending.

## ARGUMENT

### Ceglia's Motion to Transfer Venue Should Be Denied

As described below, Ceglia cannot satisfy his burden of showing that a transfer of this

prosecution from the District in which it was brought is warranted. Consequently, Ceglia's

motion to transfer venue to the Western District of New York should be denied.

### A.     Applicable Legal Standards

Rule 21(b) of the Federal Rules of Criminal Procedure provides that "for the convenience

of parties and witnesses, and in the interest of justice, the court upon motion of the defendant

may transfer the proceeding as to that defendant or any one or more of the counts thereof to

another district." Fed. R. Crim. P. 21(b). The "burden is on the moving defendant to justify a

transfer under Rule 21(b)." United States v. Spy Factory, Inc., 951 F. Supp. 450, 464 (S.D.N.Y.

1997) (citing United States v. Aronoff, 463 F. Supp. 454, 460 (S.D.N.Y. 1978)); see also United

States v. Washington, 813 F. Supp. 269, 275 (D. Vt. 1993); United States v. Wheaton, 463 F.

Supp. 1073 (S.D.N.Y. 1979). Furthermore, the moving defendant must provide "factual

substantiation" for his contentions that a transfer is in the interests of justice. United States v.

Williams, 437 F. Supp. 1047, 1051 (W.D.N.Y. 1977); see also United States v. Spy Factory, 951

F. Supp. at 456 ("the court must rely on 'concrete demonstrations'" of fact).

　　　The decision whether to grant a motion for change of venue is "vested in the sound

discretion of the district court." United States v. Maldonado-Rivera, 922 F.2d 934, 966 (2d Cir.

1990). "As a general rule a criminal prosecution should be retained in the original district" in

which it was filed, unless a court finds it would not be in the interests of justice to do so. United

States v. United States Steel Corp., 233 F. Supp. 154, 157 (S.D.N.Y. 1964); see also United

States v. Wilson, 2001 WL 798018, at *1 (S.D.N.Y. July 13, 2001) (citing United States v.

Guastella, 90 F. Supp. 2d 335, 338 (S.D.N.Y. 2000)); Spy Factory, 951 F. Supp. at 464 (citing

United States v. Posner, 549 F. Supp. 475, 477 (S.D.N.Y. 1982)). Indeed, as Judge Weinfeld's

oft-cited guidance makes clear:

> As a general rule a criminal prosecution should be retained in the
> original district. To warrant a transfer from the district where an
> indictment was properly returned it should appear that a trial there
> would be so unduly burdensome that fairness requires transfer to
> another district of proper venue where a trial would be less
> burdensome . . . .

United States v. Posner, 549 F. Supp. 475, 477 (S.D.N.Y. 1982) (quoting United States v. United

States Steel Corp., 233 F. Supp. 154, 157 (S.D.N.Y. 1964)).

　　　In assessing a motion to transfer venue, the district court should weigh a variety of

factors, including (1) the location of the defendant's residence; (2) the location of possible

witnesses; (3) the location of events likely to be at issue; (4) the location of relevant documents

and records; (5) the potential for disruption of the defendant's business if transfer is denied; (6)

expenses to be incurred by the parties; (7) the location of defense counsel; (8) the relative

accessibility of the place of trial; (9) the docket conditions of each potential district; and (10) any

other special circumstance that might bear on the desirability of the transfer. See Platt v.

Minnesota Mining Co., 376 U.S. 240, 244 (1964); Maldonado-Rivera, 922 F.2d at 966. No

single factor is dispositive in this analysis; rather, it is left to the district court to "strike a balance

and determine which factors are of greatest importance." Maldonado-Rivera, 922 F.2d at 966;

see also United States v. Stephenson, 895 F.2d 867, 875 (2d Cir. 1990).

Generally speaking, the trend has been to deny such motions. See United States v.

Quinn, 401 F. Supp. 2d 80, 85-86 (D.D.C. 2005) (citing cases and treatises). This trend

recognizes that, since the time that Platt was decided in 1964, "the massive expansion of

technology and the relative decline in costs for long-distance travel over the past few decades"

have greatly reduced the circumstances where transfer is justified. Id. at 86.

**B.    A Transfer of Venue Is Not in the Interests of Justice**

Analysis of each of the Platt factors makes clear that the Defendant has failed to meet his

burden of demonstrating that this case should not be prosecuted in the Southern District of New

York, the judicial district in which the Indictment against him was returned. Indeed, as discussed

more fully below, Ceglia has provided no compelling reason for this Court to grant the

extraordinary and rare relief that he seeks. Despite living in and pursuing his civil lawsuit to

fraudulently obtain a stake in Facebook, Inc. from Ireland for almost an entire year prior to his

arrest, Ceglia would have this Court believe that transfer to the Western District of New York is

in the interests of justice. The Defendant's argument that transfer is appropriate, despite the fact

that the Government investigated him here, interviewed witnesses located here, ultimately

charged him here, and sought compulsory process here, is simply unavailing. For these and the

following reasons, Ceglia's motion to transfer venue should be denied.

1.    **Residence of the Defendant**

While there is no dispute that Ceglia currently resides in Wellsville, New York, this fact

alone does not justify transfer. It is well established "that inconvenience of the defendant or his

business is not, by itself, a sufficient basis for a transfer," United States v. Conner, 2001 U.S.

Dist. LEXIS 1110, at *8 (S.D.N.Y. Feb. 9, 2001) (quoting United States v. Culoso, 461 F. Supp.

128, 136 (S.D.N.Y. 1978)); United States v. Antia, 1999 WL 294788, at *2 (E.D.N.Y. Mar. 22,

1999) (citing Wheaton, 463 F. Supp. at 1078), and that a defendant's residence should not be

given "dispositive weight." Spy Factory, 951 F. Supp. at 456. In fact, the law is clear that "[a]

Court should not give any factor preeminent weight . . . ." Id. at 455 (citing Maldonado-Rivera,

922 F.2d at 966 ("No one of these considerations [the Platt factors] is dispositive")). While it is

true that courts should give consideration to trying defendants where they reside, United States v.

Russell, 582 F. Supp. 600, 662 (S.D.N.Y. 1982), courts have noted that this "policy" of trying

defendants in their district of residence is "in tension with the more general presumption that a

criminal prosecution should be retained in the original district." Spy Factory, 951 F. Supp. at

464. Accordingly, a defendant's desires alone are insufficient to warrant transfer. See United

States v. Valdes, 2006 WL 738403, at *4 (S.D.N.Y. Mar. 21, 2006); United States v. Henley,

1995 WL 60019, *2 (S.D.N.Y. Feb. 10, 1995). Such a rule recognizes that "a defendant would

always like to be close to his loved ones," Valdes, 2006 WL 738403, at *4 (quoting United

States v. Layne, 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005), and that such a consideration

must be counterbalanced against the presumption that a criminal case is to be tried where it is

brought.

Additionally, whatever traction Ceglia's argument that transfer is warranted based on his current residence may have is undermined by the fact that the Defendant was living in Ireland for almost a year from at least November 2011 until mere days before his arrest on the instant charges. In fact, Ceglia engaged in much of the charged fraudulent scheme from abroad, using his civil lawsuit to fraudulently demand a significant ownership stake in Facebook, Inc. On this record, Ceglia's current residence does not counsel in favor of transfer.

Moreover, the duration of any disruption – which would occur regardless of where the defendant is tried – is not nearly so long as other cases where motions to transfer on the basis of the defendant's convenience have been denied. The Government anticipates the trial in this matter to last approximately two to three weeks. In United States v. Stein, 429 F. Supp. 2d 633 (S.D.N.Y. 2006), for example, Judge Kaplan denied a motion to transfer for the convenience of the defendants where trial was anticipated to last between six and eight months. Id. at 645.

Accordingly, while the fact of the defendant's residence in Wellsville, New York means that this factor may weigh in favor of transfer, it does so only slightly. See United States v. Coriarty, 2000 WL 1099920, at *2 (S.D.N.Y. Aug. 7, 2000) (finding factor weighed in favor of transfer only slightly where defendant lived in Florida with wife and three small children; application to transfer denied).

### 2.   Location of Witnesses

The location of witnesses who are likely to be called at trial is not a factor that weighs in favor of transfer. Although Ceglia asserts that "the key witnesses are . . . in the Western District of New York," (Memo at 8), the vast majority of the witnesses who are central to resolving Ceglia's disputed ownership interest in Facebook, Inc. are located outside the State of New York altogether, including Mark Zuckerberg (California); Ceglia's business partner at StreetFax.com,

Karin Petersen (North Carolina); a former attorney for StreetFax.com, James Kole (Illinois); and

Jeffrey Kazen (Connecticut), who helped Zuckerberg in 2003 and 2004 with programming work

for StreetFax.com. Additionally, expert witnesses who are in a position to offer relevant

testimony are located throughout the country. The reality is that, other than Ceglia and certain

members of his family, no critical witness resides in the Western District of New York.

A defendant claiming that the location of witnesses warrants a transfer of venue bears the

burden of offering the Court "specific examples of witnesses' testimony and their <u>inability to

testify</u> because of the location of trial." <u>Spy Factory</u>, 951 F. Supp. at 456 (emphasis added). The

"naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not

suffice for transfer." <u>Id</u>; <u>see also</u> <u>United States</u> v. <u>Juncal</u>, 1998 WL 473949, *5 (S.D.N.Y. Aug.

7, 1998) ("there is no basis to grant the motion to transfer" where defendant fails to make "a

specific proffer of testimony from specific witnesses to allow the court to make an informed

decision about the importance of these witnesses to [the defendant's] case"). Rather, "the court

must rely on concrete demonstrations of the proposed testimony." <u>Spy Factory</u>, 951 F. Supp. at

456 (quotations and citations omitted). Moreover, "in this age of easy air travel, this factor is

generally much less relevant than it was in 1964, when the Supreme Court decided <u>Platt</u>."

<u>United States</u> v. <u>Ebbers</u>, 2004 WL 2346154, at *1 (S.D.N.Y. 2004).

Here, in the place of specific examples of witnesses who would be unable to testify if this

case were tried in Manhattan, Ceglia offers a list of persons interviewed in connection with the

investigation and the general claim that an unspecified number of potential character defense

witnesses reside in Wellsville, New York. (Memo. at 8-9). Ceglia baldly asserts that "a

significant part of the defense case will be in the form of character testimony from his many

personal relations and business associates in Wellsville." (Memo at 8). However, the Defendant does not identify any specific individual he intends to call at trial.

Similarly, Ceglia fails to show that any potential defense witnesses would be <u>unable</u> to testify at a trial held in Manhattan. In such circumstances, courts in this District have repeatedly found that the location of witnesses in the defendant's home district did <u>not</u> weigh in favor of transfer. <u>See, e.g.</u>, <u>United States</u> v. <u>Brooks</u>, 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008) ("bare assertion" of hardship was insufficient to tip this <u>Platt</u> factor in favor of transfer); <u>Stein</u>, 429 F. Supp. 2d at 645-46 (location of the witnesses did not support transfer where defendants failed to put forward any evidence that potential witnesses would be unable or unwilling to travel to the Southern District of New York); <u>Ebbers</u>, 2004 WL 2346154, at *1 (defendant did not allege that "witnesses would be unable to testify in New York, that he would be unable to call them, or that he would be financially incapable of paying such witness' expenses").

With respect to character witnesses in particular, Ceglia's claim is especially weak. Character witnesses by their nature usually provide short opinion or reputation testimony about a defendant's character (in this case, most likely truthfulness). This kind of testimony usually involves very few witnesses because such testimony can easily become cumulative and runs the risk of wasting the jury's time.

Although the Government has not determined its trial witnesses at this early stage in the litigation, Ceglia correctly anticipates that Mark Zuckerberg and Karin Petersen will likely be Government witnesses at trial. (Memo. at 8). Neither witness, however, will find a trial in Buffalo to be more convenient than a trial in Manhattan. In fact, given the plethora of transportation options in the New York City metropolitan area, both witnesses are likely to find

-10-

trial in the Southern District of New York far more convenient. Thus, convenience to these central witnesses is not a factor supporting a transfer.

In short, because the Defendant has failed to provide a single "specific example[] of witnesses' testimony and . . . inability to testify because of the location of trial," Spy Factory, 951 F. Supp. at 456, he has simply failed to meet his burden of proving that the location of necessary and relevant defense witnesses compels a transfer to the Western District of New York.

### 3.   Location of Events

Ceglia has similarly failed to demonstrate that the location of events in this case compels transfer. The Defendant contends that the transfer is warranted because the "nerve center" of the charged fraud was in the Western District of New York. (Memo. at 10). This argument ignores critical facts, however. Not only did the ongoing fraud continue in Manhattan when Ceglia's New York City-based attorneys served certain legal documents, including the amended complaint, on the Civil Defendant's counsel in, among other places, Washington, D.C., but each and every affirmative act in furtherance of the ongoing fraud was completed in New York when, among other things, counsel for the Civil Defendants were served by Ceglia's attorneys with the various legal documents that he has employed to further his fraudulent scheme to defraud California-based Zuckerberg and Facebook, Inc.

Title 18, United States Code, Section 3237(a) expressly provides that "any offense against the United States . . . committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a) (emphasis added). Moreover, it has long been settled that in prosecution for mail fraud -- as is the case here -- trial may be held in the place of the mailing, the place of receipt of the

mail, and places through which the mailed matter passed. Hagner v. United States, 285 U.S. 427

(1932); Salinger v. Loisel, 265 U.S. 224 (1924); see also 18 U.S.C. § 3237(a). The reason for

this is that "the purpose of the mail fraud statute is to protect against" the "use of the United

States mails in furtherance of . . . [the] scheme" and "[i]t is entirely reasonable that under [the]

statute trial should be had at the place where the primary evils at which the law is directed

occur." United States v. Cashin, 281 F.2d 669, 674 (2d Cir. 1960).

   In many ways, this case is similar to that of United States v. Estrada, 2012 WL 3083477,

at *3-4 (S.D.N.Y. July 20, 2012) and United States v. Spy Factory, Inc., 951 F. Supp. 450, 464

(S.D.N.Y. 1997), where the events at issue were located outside of the Southern District of New

York but the respective courts nonetheless denied the defendants' venue transfer motions

because the defendants had intentionally projected their fraud nationwide, including into this

District. The Government respectfully submits that those decisions are controlling here as well.

### 4.    Location of Relevant Documents and Records

   As Ceglia concedes, "[g]iven the ease with which documentary evidence can be

transported electronically," (Memo at 13), the location of the relevant documents and records is,

if anything, a neutral factor.

### 5.    Disruption of the Defendant's Business

   The Defendant next argues that venue should be transferred because he "lives and works

in Wellsville, New York where he manages over a dozen residential rental properties. . . .

During the time that he is gone, he is obviously unable to respond to the myriad issues that arise

with his properties." (Memo. at 12). The Government submits that this claim is not compelling.

Trial by its very nature is disruptive to the livelihood of those on trial. Standing trial in the

Western District of New York would require the defendant to be absent from his business during

-12-

normal business hours and, at best, would force him to have minimal contact with his clientele.

That would be true regardless of where trial occurs. In addition, Ceglia's wife and parents have

previously helped operate the business and could continue to do so during trial. Moreover, and

tellingly, Ceglia managed his business from Ireland, where he was living for almost a year –

from at least November 5, 2011 until October 24, 2012. In the modern era of telephones, e-mail,

and fax machines, it is unclear how contact by these methods of communication would be

insufficient to establish the minimal contact that would be available to Ceglia during lunch

breaks and after court proceedings in Buffalo. See Spy Factory, 951 F. Supp. at 458-59

(defendant failed to demonstrate why telephone and fax communication would be insufficient to

maintain contact with defendant's employer). Thus, the purported disruption to the Defendant's

business is not a factor that favors transfer of this case.

      6.    **Expenses to the Parties**

      The Defendant further argues for a transfer of venue on the ground that he will face a

"significant" financial burden if required to defend himself in Manhattan. (Memo. at 12-13).

The Defendant's argument, however, ignores certain critical facts that, when considered, tip this

factor strongly against transfer of the case to the Western District of New York.

      First and foremost, the Defendant completely ignores the tremendous expense that would

be incurred by the Government which has investigated and charged him here, if the case were

transferred to the Western District of New York. Were this case transferred to that judicial

district, the Government would have to move two Assistant United States Attorneys, a paralegal,

and at least one Postal Inspector to Buffalo in order to conduct the trial. Courts in this District

have repeatedly denied transfer motions in part because the expense of transfer to the

Government was too significant to warrant transfer. See, e.g., Ebbers, 2004 WL 2346154, at *2

("It would impose an enormous burden on the government to move the prosecutors,

investigators, support staff, court staff, and others familiar with the case . . . to another

jurisdiction"); United States v. Carey, 152 F. Supp. 2d 415, 422-23 (S.D.N.Y. 2001) (denying

transfer motion on the basis that "if venue is transferred to the District of Columbia, the effect is

merely to shift the economic burden to the government").

Tellingly, the Defendant does not claim that the expenses he will incur will prejudice his

defense. As an initial matter, Ceglia has not retained any lawyers to defend against the criminal

charges, but has instead had counsel appointed by the Court to represent him. The Federal

Defenders Office will thus shoulder the expense of defending Ceglia, whether it be in Manhattan

or in Buffalo.

In deciding whether to transfer a case for convenience, courts in this District focus on

whether the expenses that the defendant will incur trying a case in Manhattan will affect his

ability to mount a defense. Where courts have found that the expense of a trial in New York

City, no matter how significant, will not prejudice the defendant's ability to defend himself,

courts have denied transfer motions. See Spy Factory, 951 F. Supp. at 459 (holding that factor of

expenses did not weigh in favor of the defendants where "defendants Kimball and Spy Factory,

Inc. have not demonstrated that they are financially incapable of funding their defense"; motion

for transfer denied); see, e.g., Wilson, 2001 WL 798018, at *2 (denying transfer motion where

one defendant was paying for wife and two sons to relocate to New York); Aronoff, 463 F. Supp.

at 460-61 (denying transfer motion where defendant "does not state that he would be financially

unable to either return to Detroit periodically during trial, or to bring his family with him.").

Here, Ceglia offers nothing more than "a bald assertion that a trial out of a defendant's

home district would be more expensive than if the trial were held in the defendant's home

-14-

district." Valdes, 2006 WL 738403, at *7. The Defendant makes no showing of how the

expense of a trial in the Southern District of New York might prejudice the quality of his

defense. In sum, while a trial in Manhattan will certainly be costly, Ceglia has not carried his

burden of showing that the added expense of trying this case in this District warrants a transfer of

this case in the interests of justice.

### 7.     Location of Counsel

The location of counsel favors New York City, as both the Government attorneys who

will be trying the case as well as Ceglia's court-appointed counsel are located in Manhattan.

### 8.     Relative Accessibility

While Ceglia contends that Buffalo and Manhattan are of comparable accessibility, the

Government would respectfully argue that Manhattan is far more accessible, whether it be by

airplane, train, or bus. Accordingly, this Platt factor is, if anything, neutral. See Layne, 2005

WL 1009765, at *6; Guastella, 90 F. Supp. 2d at 341; Spy Factory, 951 F. Supp. at 460.

### 9.     Docket Conditions

The Defendant concedes that the relative docket conditions of the Southern and Western

Districts of New York are "roughly equivalent." (Memo. at 13). Accordingly, this Platt factor

does not favor transfer.

## CONCLUSION

In sum, the Defendant has failed to satisfy his burden of demonstrating by concrete illustrations of fact that a transfer of this case to the Western District of New York is required "in the interests of justice." Fed. R. Crim. P. 21(b). Simply put, Ceglia has not established anything beyond the ordinary inconvenience and interference with normal personal activities that occur whenever a defendant is standing trail for serious criminal charges. Accordingly, for all of the reasons set forth above, the Defendant's motion to transfer venue should be denied.

Dated: New York, New York
      February 6, 2013

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Janis M. Echenberg
Christopher D. Frey
Assistant United States Attorneys
Telephone: (212) 637-2597/2270

## AFFIRMATION OF SERVICE

CHRISTOPHER D. FREY hereby affirms pursuant to Section 1746 of Title 28, United States Code:

1.    I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York.

2.    On February 6, 2013, I caused a true and correct copy of the foregoing Government's Memorandum of Law in Opposition to Defendant Ceglia's Motion to Transfer Venue, via the Court's Electronic Case Filing system on:

> David E. Patton, Esq.
> Federal Defenders of New York, Inc.
> 52 Duane Street, 10th Floor
> New York, New York 10007
> *Counsel for Paul Ceglia*

3.    I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated:    New York, New York
         February 6, 2013

CHRISTOPHER D. FREY

# EXHIBIT C

## Dealbook.nytimes.com Article
## Man Claiming Facebook Ownership Arrested on Fraud Charges

http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/

The New York Times

# **DealBook**

Legal/Regulatory October 26, 2012, 2:44 pm 7 Comments

# **Man Claiming Facebook Ownership Arrested on Fraud Charges**

*By PETER LATTMAN*


John Anderson/Wellsville Daily ReporterPaul Ceglia, who prosecutors said filed a bogus lawsuit claiming a stake in Facebook.

In 2010, a New York entrepreneur made an explosive legal claim: an agreement that he had with Facebook's founder, Mark Zuckerberg, entitled him to a major stake in the social-networking giant.

Mr. Zuckerberg staunchly denied the claim, and his lawyers insisted that the entrepreneur, Paul Ceglia, was a scam artist.

On Friday, federal authorities sided with Mr. Zuckerberg, arresting Mr. Ceglia and charging him with a multibillion-dollar scheme to defraud Facebook.

Prosecutors say that Mr. Ceglia, 39, of Wellsville, N.Y., filed a sham federal lawsuit claiming to have been promised a 50 percent share of Facebook in 2003, and doctored, fabricated and destroyed evidence to support his claims.

- ▮Documents: Complaint Against Paul Ceglia

http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/

"Ceglia's alleged conduct not only constitutes a massive fraud attempt, but also an attempted corruption of our legal system through the manufacture of false evidence," said Preet Bharara, the United States attorney in Manhattan. "Dressing up a fraud as a lawsuit does not immunize you from prosecution."

Mr. Ceglia made an appearance in Federal District Court in Buffalo on Friday afternoon and pleaded not guilty. His lawyer, Dean Boland, did not return telephone calls seeking comment.

Mr. Ceglia's claims received outsize attention in part because he made them around the time of the release of "The Social Network," the Academy Award-winning film that told the tale of Mr. Zuckerberg's legal battle with his Harvard schoolmates, the Winklevoss twins, over the origins of Facebook. Mr. Zuckerberg paid the Winklevosses at least $65 million to settle their case.

From the moment the lawsuit was filed, Facebook's lawyers have called Mr. Ceglia a mountebank and raised questions about his credibility. In 1997, Mr. Ceglia pleaded guilty to possessing hallucinogenic mushrooms. And in 2010, the New York State attorney general criminally charged him with defrauding customers in a now-defunct wood pellet manufacturing business that he had run with his wife.

Questions are now also being raised about the lawyers who represented Mr. Ceglia and kept his case alive for two years.

Gonzalo Fuentes/ReutersMark Zuckerberg, the chief executive of Facebook.

In his original lawsuit, filed in 2010, Mr. Ceglia was represented by Paul Argentieri, a sole practitioner in upstate New York. An amended complaint was filed in April 2011 by Robert W. Brownlie of DLA Piper, the world's largest law firm, and Dennis C. Vacco, a former New York attorney general now in private practice at Lippes Mathias Wexler Friedman in Buffalo.

http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/

Last year, Mr. Brownlie of DLA Piper declined a request by The New York Times to produce the original documents backing his client's legal claims. "That will come out during the course of litigation," Mr. Brownlie said. "Anyone who claims this case is fraudulent and brought by a scam artist will come to regret those claims."

Yet court records indicate that other lawyers were flagging serious concerns with the authenticity of Mr. Ceglia's evidence. Before he retained DLA Piper and Lippes Mathis, Mr. Ceglia hired another law firm, Kasowitz Benson Friedman & Torres. But Kasowitz Benson withdrew its representation and told DLA Piper and Lippes Mathias that it believed that Mr. Ceglia's purported contract with Mr. Zuckerberg was a fraud.

Mr. Brownlie and Mr. Vacco later withdrew as lawyers in the case. They did not return calls and e-mails seeking comment.

Mr. Ceglia's actions date to 2003, when Mr. Zuckerberg was a student at Harvard University. Mr. Zuckerberg responded to an advertisement on Craigslist placed by Mr. Ceglia, who needed a programmer to help with an Internet business he had started. Mr. Ceglia hired Mr. Zuckerberg and agreed to pay him $1,000 for his work.

Months later, in his college dorm room, Mr. Zuckerberg started a business called Facebook.

Mr. Zuckerberg did not hear from Mr. Ceglia again until 2010, when he was served with a complaint that claimed Mr. Ceglia was entitled to a significant ownership stake in the social network.

According to the lawsuit, as part of their business dealings, Mr. Zuckerberg had promised him a substantial interest in either "The Face Book" or "The Page Book." Attached to the legal papers was a contract that contained language giving Mr. Ceglia an interest in Mr. Zuckerberg's start-up. The filing also included e-mail exchanges between Mr. Ceglia and Mr. Zuckerberg that purported to show their collaboration on business ideas.

Federal prosecutors say that Mr. Ceglia's claims — and the documents supporting them — were entirely false. Government investigators searched Mr. Ceglia's hard drive and discovered the original contract, which made no reference to Facebook. And Harvard's e-mail servers had no record of the e-mails.

Facebook's lawyers at Gibson, Dunn & Crutcher commended the Justice Department and suggested that they could pursue possible claims against the lawyers who represented Mr. Ceglia.

"Ceglia used the federal court system to perpetuate his fraud and will now be held accountable for his criminal scheme," said Orin Snyder, a partner at Gibson Dunn. "Facebook also intends to hold accountable all of those who assisted Ceglia in this outrageous fraud."

A version of this article appeared in print on 10/27/2012, on page B2 of the NewYork edition with the headline: Man Claiming Facebook Ownership Faces Fraud Case.

# EXHIBIT D

## Dueling Experts Table

# Dueling Experts Table

Illustrates Opposing Expert Opinions on Every Conclusion Presented by Defendants' Experts

| Defendants' Expert Conclusion | Dueling Expert Conclusion |
|---|---|
| Laporte Conclusion #1<br>"The ink in the interlineation on page 1 of the Work for Hire document was not placed on the document on April 28, 2003. It is highly probable that the interlineation was produced within 24 months prior to August 28, 2011 (the date the testing was conducted)." Doc. No. 326 at 24. | 1.) Defendants' own expert, Albert Lyter, found "Because of the deterioration of the ink, the TLC results were not useable and I could not perform Ink Identification, TLC Densitometry or Relative Aging" Doc. No. 328 at 9.<br><br>2.) Plaintiff's expert Larry Stewart found that "It is not possible to perform 'Ink age' determination on the Facebook Contract. This is due to the degradation of the ink and paper, the lack of knowledge of the storage conditions and their potential affect on aging characteristics and the failure to identify the formula of inks so as to have basic knowledge of the original compositions." Doc. No. 416-3 at 23. |
| Laporte Conclusion #2<br>"When the Work for Hire document was presented to me for inspection by Plaintiff's counsel on July 16, 2011, the paper and inks on the front of pages 1 and 2 were severely degraded due to a photochemical reaction. There is unequivocal evidence that the Work for Hire document was exposed to sunlight or another intense energy source for a prolonged period, probably over a span of weeks." Doc. No. 326 at 24. | Plaintiff's expert Larry Stewart concluded, "The yellow discoloration/ damage evident in the Facebook Contract is, in my opinion, the result of repeated exposure of the document to high intensity and/or UV lights.", and "Upon review of the videotapes made of the examinations by both Defendants' and Plaintiff's experts, it is evident that the Facebook Contract yellowed dramatically between the time when the document was provided to the Defendants' experts and when it was made available to the Plaintiff's experts." Doc. No. 416 at 15. |
| Laporte Conclusion #3<br>"Based on the totality of all of the forensic evidence and a review of multiple declarations and briefs, the Work for Hire document was deliberately exposed to sunlight or another intense energy source | Plaintiff's expert James Blanco states, "I observed Facebook's experts repeatedly exposing the Facebook Contract to UV light as well as other light sources. Even though I was on the other side of the room, I could see the lights of the VSC glowing from around |

| | |
|---|---|
| for a prolonged period. This intentional exposure occurred after January of 2011, when Plaintiff's experts Valery Aginsky and John Paul Osborn took high-resolution scans of the document, and prior to the inspection by Defendants' experts beginning on July 14, 2011. The fact that Plaintiff has proffered an explanation of how the document was damaged that is wholly inconsistent with the forensic evidence provides unequivocal support for this conclusion." Doc. No. 326 at 24. | the sides of the unit. I further noted that the documents were repeatedly tested on the "ESDA" machine by Gus Lesnevich and his assistant Khody Detwiler.", Doc. No. 415 at 65, and "I was so concerned about the excessive processing by Facebook experts that at one point I asked Tytell, who was at the VSC machine, what settings he was using for his UV examinations" Id. at 66. |
| Laporte Conclusion #4 "The deterioration of the "Work for Hire" document did not occur during the forensic examination of the document by Defendants' experts." Doc. No. 326 at 25. | Plaintiff's expert James Blanco concluded, "The front sides of page 1 and page 2 of the Facebook Contract were deteriorated/ "yellowed", the probable cause having been the result of defendants' experts excessive document processing and mishandling of the documents." Doc. No. 415 at 88. |
| Laporte Conclusion #5 "Page 1 and page 2 of the Work for Hire document were not produced contemporaneously, at the same time, based on the following:<br><br>a. The formatting for the paragraphs and the typeface of the text (font) on page 1 are different than the formatting and typeface used on page 2.<br><br>b. The paper used for pages 1 and 2 is different, and it is probable that each page originates from different sources. This conclusion is based on different physical characteristics, optical properties, and chemical compositions.<br><br>c. The toner used on page 1 of the Work for Hire document is different from the toner used for page 2. Therefore a different source of toner was used to produce the documents. | a. Plaintiff's expert James Blanco concluded, "[T]he difference in font between page 1 and page 2 is readily explained by the common occurrence that when documents are pieced together by means of "cutting and pasting" sections from other source documents, the fonts of those other sections that were cropped from other documents come along in the transposition and when inserted into sections of the new document being created, may or may not match the other fonts of the document being typed." Doc. No. 415 at 91.<br><br>b. Concerning the similarities between page 1 and page 2 of the Work for Hire document, Plaintiff's expert Walter Rantanen found, "The fiber content of the two vials is consistent with coming from the same mill and production run." Doc. No. 421 at 2.<br><br>c. Plaintiff's expert Larry Stewart |

| | |
|---|---|
| The use of different toners means that either a different printing device or different cartridge of toner was used to produce pages 1 and 2.<br><br>d.  Taken together, the physical and chemical examinations showed that different inks were used to create the written entries on page 1 when compared to the inks on page 2. The inks used for the signatures on page 2 in the names of Paul Ceglia (Ink 3) and Mark Zuckerberg (Ink 4) were different from each other, and both were different from the inks used on page 1 of the Work for Hire document."  Doc. No. 326 at 26. | found, "Test results indicate that the toner found on page 1 matches that found on page 2.", and "Exhaustive chemical and physical testing failed to detect any differences between the toner samples." Doc. No. 416 at 24.<br><br>d.  Defendants' own expert Lyter concluded that ink identification was not possible.  Doc. No. 328 at 9.  Laporte himself (see Laporte Conclusion #8) concluded that the ink formulation cannot be determined. |
| Laporte Conclusion # 6<br>"There were some indentations from handwriting observed on the Work for Hire document—specifically, a portion of the impressed entry on page 2 coincides with the same text on page 1—but the results from the indentation examination are inconclusive due to the deterioration of the document. And even if the impression originated from the interlineation, the only conclusion that could be drawn is that page 1 was over the top of page 2 at the time that the handwritten interlineation was made on page 1. It does not provide any evidence that pages 1 and 2 were created contemporaneously or that the Work for Hire document is authentic."  Doc. No. 326 at 26. | Plaintiff's expert James Blanco concludes, "[P]age 1 was indeed over the top of page 2 when the hand printed interlineation was written on page 1." Doc. No. 415 at 54. |
| Laporte Conclusion #7<br>"There is no evidence to refute the possibility that another page, other than page 1 of the Work for Hire document, was originally stapled to page 2 and removed at a later time."  Doc. No. 326 at 26. | Plaintiff's expert James Blanco concludes, "The staple holes and secondary staple hole impressions/detent marks of page 1 of the Facebook Contract match the staple holes and secondary staple hole impressions/ detent marks of page 2 of the Facebook Contract. That is, the staple holes on both pages align demonstrating that these two pages of the Facebook Contract have only been stapled one time wherein they |

3

| | were actually stapled together.", and "On this regard, the evidence does not support any theory that page 1 was attached to page 2 by hand using a staple (that is, not using an actual stapler but connecting the two pages together with a staple by hand)." Doc. No. 415 at 88. |
|---|---|
| Laporte Conclusion #8<br>"None of the results could be used to determine whether or not page 2 of the Work for Hire document was produced on April 28, 2003. In part, the testing was hindered by the fact that the inks were severely compromised due to the deterioration of the document and TLC could not be used to determine the availability of the ink formulation." Doc. No. 326 at 26. | Laporte acknowledges that the ink formulation cannot be determined.<br><br>Other than Lesnevich, none of Defendants' experts found any evidence that page 2 of the Work for Hire document was anything other than authentic. |
| Romano Conclusion A<br>"The 'WORK FOR HIRE' document is, at least in part, forged." Doc. No. 327 at 12. | 1.) Plaintiff's expert James Blanco concluded, "The original Facebook Contract...examined by all of the document experts is an authentic, unaltered document. The sum of the evidence reveals that page 1 of the Facebook Contract was originally executed together with page 2 as a companion document. Based on the detailed forensic analysis of this two-page document, there is no justification or support for the defendant's theory of a page 1 substitution, forgery or fraud. The sum of the evidence shows that page 1 was not a later inserted page to the original two-page document set." Doc. No. 415 at 232.<br><br>2.) Plaintiff's expert Larry Stewart concluded, "After a thorough and exhaustive forensic testing of the Facebook Contract (Work For Hire) (Exhibit Q1), there is no indication to suggest the Contract is anything other than genuine. In addition, there is no evidence to support that the Facebook Contract is altered." Doc. No. 416-3 at 21. |

| | |
|---|---|
| <u>Romano Conclusion B</u><br>"Page 1 of the 'WORK FOR HIRE' document is an amateurish forgery."  Doc. No. 327 at 12. | Plaintiff's expert James Blanco counters, "Review of Romano's CV/Resume reveals that Romano lacks the industry standard qualifications to opine as a Forensic Document Examiner- particularly in regard to his assertion that page 1 of the Facebook Contract was an "amateurish forgery" (Document 327 Page 12). His opinion and report, therefore, should be considered in light of his lack of qualifications to opine as a court-qualified expert on the matters which are the subject of his report." Doc. No. 415 at 23. |
| <u>Romano Conclusion C</u><br>"Page 1 and Page 2 of the 'WORK FOR HIRE' document were printed on different printers."  Doc. No. 327 at 12. | Plaintiff's expert Larry Stewart found, "Physical analysis resulted in a determination that both pages 1 and 2 of the Facebook Contract were printed with an office machine that utilized toner, e.g. a laserjet printer." Doc. No. 416 at 23, and "Test results indicate that the toner found on page 1 matches that found on page 2." Id. at 24. |
| <u>Romano Conclusion D</u><br>"Page 1 of the 'WORK FOR HIRE' document was printed on a more recent printer than Page 2 of the 'WORK FOR HIRE' document."  Doc. No. 327 at 12. | Plaintiff's expert James Blanco concludes, "Contrary to Romano's claim, my Figure 8 and Figure 9 photographic enlargements are produced here to demonstrate that there is no perceivable difference in "edge definition" as alleged by Romano."  Doc. No. 415 at 23. |
| <u>Romano Conclusion E</u><br>"The typeface, point sizes, and formats of Page 1 and Page 2 of the 'STREET FAX' document are significantly more consistent than those of Page 1 and Page 2 of the 'WORK FOR HIRE' document."  Doc. No. 327 at 12. | Plaintiff's expert James Blanco points out, " I know of no properly trained Forensic Document Examiner who would perform a font (typestyle) analysis on such extremely deteriorated evidence. Any proffered opinion regarding classifying or identifying the typestyle in this regard lacks any reasonable forensic basis and is not worthy of due consideration. Since Tytell claims special knowledge in typography, I suspect that even he would disagree with the findings and opinions of Romano in this regard.  Indeed, Tytell offered no such findings as Romano on |

Dbt f !2;21.dw.1167: .SKB.MHGI!!Epdvn f ou721.2!!!Gjrhe!22087023!!!Qbhf !7!pg21

| | this point." Doc. No. 415 at 25. |
|---|---|
| Romano Conclusion F<br>"Page 1 of the 'WORK FOR HIRE' document appears to be a modification of Page 1 of the 'STREET FAX' document." Doc. No. 327 at 12. | Plaintiff's expert James Blanco concluded, "Page 1 of the STREET FAX "smoking gun" document was not the original companion page attached to page 2 of the Facebook Contract" Doc. No. 415 at 90. |
| Lyter Conclusion #1<br>"The "Work for Hire" document was intentionally exposed to excessive environmental conditions, probably sunlight for an extended period of time, which caused the deterioration of the paper and the ink now present on the document." Doc. No. 328 at 8. | Plaintiff's expert Larry Stewart concluded, "The yellow discoloration/ damage evident in the Facebook Contract is, in my opinion, the result of repeated exposure of the document to high intensity and/or UV lights.", and "Upon review of the videotapes made of the examinations by both Defendants' and Plaintiff's experts, it is evident that the Facebook Contract yellowed dramatically between the time when the document was provided to the Defendants' experts and when it was made available to the Plaintiff's experts." Doc. No. 416 at 15. |
| Lyter Conclusion #2<br>"The intentional deterioration of the 'Work for Hire' document thwarted my ability to assess the authenticity of the questioned documents using TLC analysis and Ink Identification and Relative Aging methodologies." Doc. No. 328 at 9. | Defendants' expert Lyter's conclusion that he was unable "to assess the authenticity of the questioned documents using TLC analysis and Ink Identification and Relative Aging methodologies" should cause the weigher of facts to question the validity of Defendants' other experts' test results. |
| Lyter Conclusion #3<br>"The 'Work for Hire' document was altered by exposure to excessive environmental conditions, most likely sunlight for an extended period of time, at some point during the time period from January 2011 to the Defendants' experts' examinations in mid-July 2011." Doc. No. 328 at 9. | Plaintiff's expert James Blanco concluded, "The front sides of page 1 and page 2 of the Facebook Contract were deteriorated/ "yellowed", the probable cause having been the result of defendants' experts excessive document processing and mishandling of the documents." Doc. No. 415 at 88. |
| Lesnevich's 1st Report, Conclusion #1<br>"There are at least 20 significant dissimilarities between the handwritten interlineations on the Questioned Documents, | Plaintiff's expert James Blanco has concluded differently, "I have performed detailed analysis of these different documents and have determined that they are just four |

| | |
|---|---|
| all of which Plaintiff Paul Ceglia has proffered as images of the same physical document." Doc. No. 329 at 31. | different copies of the same document page, only scanned/copied and reprinted by various different machine processes." Doc. No. 415 at 27. |
| Lesnevich's 1st Report, Conclusion #2 "Based on my examination of the questioned handwritten interlineations, including but not limited to the 20 significant dissimilarities described above, I conclude to the highest degree of certainty possible, beyond any reasonable doubt, that the Questioned Documents are images of at least two different physical documents." Doc. No. 329 at 31. | Lesnevich himself said, "[T]he poor reproduction quality and distortion of the questioned written entry . . . makes the scanned copy unsuitable for examination and comparison of the handwriting that appears on the document." Doc. No. 52, para. 15-16. |
| Lesnevich's 1st Report, Conclusion #3 "Therefore, Ceglia has proffered at least two different physical documents as the Work for Hire document. In particular, Ceglia produced a Work for Hire document to Defendants' experts in July 2011 that was different than the document he attached to his Complaint." Doc. No. 320 at 31. | Lesnevich's comparison and conclusions are flawed and unreliable because he was unwittingly comparing a grossly altered copy of the FB contract with the original. Doc. No. 481 at 39. |
| Lesnevich's 2nd Report, Conclusion #1 "Ceglia has proffered at least two different physical documents as the Work for Hire document." Doc. No. 472-1 at 73. | Plaintiff's expert James Blanco has concluded differently, "I have performed detailed analysis of these different documents and have determined that they are just four different copies of the same document page, only scanned/copied and reprinted by various different machine processes." Doc. No. 415 at 27. |
| Lesnevich's 2nd Report Conclusion #2 "The questioned 'Mark Zuckerberg' signature and date of signature on the Work for Hire document were not written by Mark Zuckerberg." Doc. No. 472-1 at 73. | Plaintiff's expert Blanco has found the opposite, "Another significant finding was that this "Mark Zuckerberg" signature was written rapidly revealing free flowing and spontaneous rhythm. Examinations did not reveal evidence that rose to demonstrate tremor, patching or misinterpretation of letter construction to argue that this questioned no evidence of a trace forgery." Doc. No. 415 at 38. |

| Lesnevich's 2nd Report Conclusion #3<br>"The questioned "MZ" initials on the Work for Hire document were not written by Mark Zuckerberg." Doc. No. 472-1 at 74. | Plaintiff's expert Blanco concluded the opposite, "Given all of these observed handwriting similarities, the handwriting features present in the questioned "MZ" initials did represent the natural, normal and genuine handwriting characteristics of Mark Zuckerberg as demonstrated by his EXHIBIT 19 known specimen initials." Doc. No 415 at 46. |
|---|---|
| Lesnevich's 2nd Report Conclusion #4<br>"The questioned "Paul Ceglia" signature and date of signature on the Work for Hire document are tracings." Doc. No 472-1 at 74. | Plaintiff's expert Blanco's conclusion, sums it all up. "The original Facebook Contract...examined by all of the document experts is an authentic, unaltered document. The sum of the evidence reveals that page 1 of the Facebook Contract was originally executed together with page 2 as a companion document. Based on the detailed forensic analysis of this two-page document, there is no justification or support for the defendant's theory of a page 1 substitution, forgery or fraud. The sum of the evidence shows that page 1 was not a later inserted page to the original two-page document set." Doc. No. 415 at 232. |
| Tytell Conclusion #1<br>"The two-page Work for Hire document is not consistent with the normal preparation of a two-page document. Rather the use of multiple type styles and the pattern of ink usage indicate preparation of the two pages at different times." Doc. No. 330 at 13. | Plaintiff's expert James Blanco concluded, "The font (typestyle) of page 1 of the Facebook Contract is obviously different than the font of page 2 of the Facebook Contract. However the different fonts are indicative of laypersons creating a contract, which on its own, does not provide indicia of a forged document." Doc. No. 415 at 89. |
| Tytell Conclusion #2<br>"The deteriorated condition of the ink and paper on the Work for Hire document when Mr. Argentieri produced it at 9:11 AM on July 14, 2011 are classic indicia of an attempt to artificially accelerate the aging of a document, an attempt that took place prior to the production of the Work for Hire document on July 14, 2011." Doc. No. 330 at 13. | The Court stated its position by asking Plaintiff's counsel, "Don't you agree that they [Defendants] have not established that Mr. Ceglia is responsible for any discoloration?" Hearing Trans. 12-13-11 at 67-68. |

| | |
|---|---|
| Stroz Friedberg Conclusion #1<br>"Stroz Friedberg found direct and compelling digital forensic evidence that the documents relied upon by Mr. Ceglia to support his claim are forged." Doc. No. 325 at 60. | "Neither of Defendants' computer experts are certified fraud experts. Rose Depo. at 208, McGowan Depo. at 7. In contrast, Plaintiff's computer forensics expert, Neil Broom, is a certified fraud expert. Doc. No. 417 at 2. Plaintiff's expert, Neil Broom, found that all the 'anomalies' identified by Stroz were not conclusive evidence of fraud. Doc. No. 417." Doc. No. 481 at 44. |
| Stroz Friedberg Conclusion #2<br>"Stroz Friedberg also found what it believes to be the authentic contract between Mr. Ceglia and Mr. Zuckerberg. That contract contains no references to Facebook." | Plaintiff's expert James Blanco concludes, "Page 1 of the STREET FAX "smoking gun" document was not the original companion page attached to page 2 of the Facebook Contract:" Doc. No. 415 at 90.<br><br>Plaintiff's expert James Blanco also states, "The STREET FAX "smoking gun" document exists only as two computer image ("tiff") files; no original has been produced for analysis. Although these two image files offer extremely poor legibility, it was determined that the STREET FAX page 1 does not represent a supposed original to page 2 of the Facebook Contract for the following reasons:<br><br>• 1.) The presence of the actual staple in the STREET FAX image file argues that had page 1 of the STREET FAX document really been the original companion page to page 2 of the Facebook Contract, then page 2 of the Facebook Contract should reveal an extra set of staple holes, which it does not. Id.<br><br>• 2.) The visible hand printed interlineation as observed on page 1 of the STREET FAX tiff image was not the source of the hand printed latent image on page 2 of the Facebook Contract since it does not match the proper position of where the |

Dbt f !2;21.dw.1167: .SKB.MHGl!!Epdvn f ou721.2!!!Gjrfhe!22G87G23!!!Qbhf !21!pg21

| | latent impression was discovered on page 2 of the original of the Facebook Contract examined by the document expert. Id. |
| --- | --- |
| | • 3.) The "PC" initials discovered as a latent writing impression on page 2 of the original Facebook Contract match the position of the visible "PC" initials on page 1 of the original of the Facebook Contract and do not match the position of the "PC" initials observed on the poor quality tiff image of page 1 of the STREET FAX document reference EXHIBIT 33 hereto. Id. at 91 |
| | • 4.) In support of item 2 above, the verb "is," which appears as the visibly hand printed verb in the interlineation on page 1 of the Facebook Contract, and which also appears as the latent handwritten verb on page 2 of the Facebook Contract, is not the same verb for the interlineation on the STREET FAX document. The verb used for the STREET FAX hand printed interlineation was the word "has" rather than "is." Id. |
| | • 5.) The column measurements between the two pages of the STREET FAX document are substantially different from one another." Id. |

# EXHIBIT E

## Hearing Transcript Excerpts of June 30, 2011 (pages 22-35)

Pre-trial Proceedings in *Ceglia v. Zuckerberg et al*, case number 1:10-cv-00569-RJA-LGF
Reference at page 25 of Memorandum of Law to Transcript page 30, lines 5-9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL D. CEGLIA,

                    Plaintiff,

          -vs-                          10-CV-569A

MARK ELLIOTT ZUCKERBERG and
FACEBOOK, INC.,

                    Defendants.

_____

               Proceedings held before the

          Honorable Leslie G. Foschio,  U.S.

          Courthouse, 68 Court Street, Buffalo,

          New York on June 30, 2011.


          APPEARANCES:

          JEFFREY ALAN LAKE, ESQ.,
          Appearing for Plaintiff.

          ORIN S. SNYDER, ESQ.,
          MATTHEW BENJAMIN, ESQ.,
          TERRANCE P. FLYNN, ESQ.,
          Appearing for Defendants.


          AUDIO RECORDER:  Sandra Wilson

          TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                           Official Reporter,
                           U.S.D.C. W.D.N.Y.
                           716/332-3560


          (Proceedings recorded by electronic sound
          recording, transcript produced by computer.)

1  plaintiff is perpetuating the most serious kind of

2  fraud on the court imaginable.

3          THE COURT:  And when the polygraph

4  examination was conducted, plaintiff's counsel was

5  aware that that was your position?

6          MR. SNYDER:  Fully aware.  We'd already

7  submitted --

8          THE COURT:  How would they have seen that,

9  through this motion?

10          MR. SNYDER:  Yes.  On June 2nd we

11  submitted our motion.

12          THE COURT:  When was the polygraph exam

13  again, I forgot?

14          MR. SNYDER:  Between June 2nd and June

15  10th.

16          THE COURT:  Thank you.

17          MR. SNYDER:  We hired, your Honor,

18  Professor Romano, Frank Romano from Rochester

19  Institute of Technology, who is considered, if not

20  the world renowned expert in document examination,

21  at the very top of -- of that industry.  Again,

22  hired by the United States Department of Justice --

23          THE COURT:  I read his credentials.

24          MR. SNYDER:  His report is also

25  devastating, because he concludes without even

1 inspecting the original and conducting the testing

2 that we think is so important to confirm and fully

3 expose the fraud, he concludes based on the copy

4 that this is amateurish forgery, and your Honor has

5 read, of course, so I won't repeat the actual

6 factual findings that --

7    THE COURT: And, of course, they have an

8 expert who I thought rather neatly rebutted that.

9    MR. SNYDER: I don't think so, your Honor.

10    THE COURT: You don't think so?

11    MR. SNYDER: I thought the expert was

12 hedgy.

13    THE COURT: Well, he attempted to neatly

14 rebut it.

15    MR. SNYDER: I thought he hedged, was

16 equivocal, and actually did not come out and say

17 that the document was authenticate. All he said is

18 that page 1 sits on page 2, and there are

19 indentations on page 2 from page 1 which, of

20 course, could and we believe was done at or around

21 the time the forgery occurred many, many years

22 after this relationship ended.

23   But, as your Honor saw, when the plaintiff

24 doctored page 1 of the contract to manufacture the

25 contract for this lawsuit, he made a mistake that

1   we believe also exposed his fraud with the LLC.

2   And they make short shrift of that, but the fact

3   that page one says StreetFax, LLC, page 2 says

4   StreetFax, Inc.

5           THE COURT: I don't want to quibble too

6   much, and I have read all of this, so -- but I

7   thought there was a plausible explanation for that.

8   He just assumed it was a corporation and being a

9   layperson put down LLC according to the plaintiff.

10          MR. SNYDER: That would make sense, your

11  Honor, if page 2 also said StreetFax, LLC. But it

12  didn't. Page 2 of the contract said StreetFax,

13  Inc.

14          THE COURT: We're talking about a layman

15  who put together a, basically, a kitchen-table

16  contract to his potential advantage or

17  disadvantage, and didn't consult a lawyer, if it is

18  an authentic contract and -- but coming back to the

19  point, Mr. Zuckerberg does agree that he signed

20  some sort of an instrument with Mr. Ceglia. We

21  sort have got away from that.

22          MR. SNYDER: Yes, and that's what makes

23  the fraud so pernicious, because he is using --

24          THE COURT: Where is that contract?

25          MR. SNYDER: I think Mr. Argentieri, lead

1    counsel, who is not present, but he's lead counsel,

2    has it allegedly, according to reports. We've been

3    asking to see it for a year.

4              THE COURT: So you think there's two

5    instruments? There's the original which is the

6    real contract between Mr. Zuckerberg and Mr. Ceglia

7    relative to Street Search that's in the safe

8    deposit box, and what was attached to the complaint

9    is this concoction?

10             MR. SNYDER: No, your Honor.

11             THE COURT: No.

12             MR. SNYDER: The one that is in the safe

13   is the fraudulent document --

14             THE COURT: Oh.

15             MR. SNYDER: -- which we want to test.

16             THE COURT: The original?

17             MR. SNYDER: The original version of the

18   doctored contract, which came into existence we

19   believe recently.

20             THE COURT: I was talking about the

21   contract that Mr. Zuckerberg apparently agrees he

22   did sign with Mr. Ceglia.

23             MR. SNYDER: I do not know, your Honor, if

24   the plaintiff still has a copy of the authentic

25   real contract.

26

1        THE COURT:  Because the plaintiff could --

2   claims that this is the original contract.

3        MR. SNYDER:  Of course, right.

4        THE COURT:  But Mr. Zuckerberg was not

5   given a copy or duplicate of the actual Street

6   Search contract that he agrees that apparently he

7   did sign.

8        MR. SNYDER:  Your Honor, he was 18 years

9   old at the time.  He was a freshman at college.

10   And this event in his life at the time was a

11   meaningless event.  It was insignificant in the

12   context of his life.  Like most 18 year olds who

13   pack up their dorms and move away for the summer,

14   whether he had it or didn't have it, doesn't have

15   it today, it was a --

16        THE COURT:  Does he recall having it?

17        MR. SNYDER:  He certainly recalls signing

18   the contract, and recalls without qualification,

19   without question, without ambiguity that the only

20   business he did with this man related to StreetFax,

21   period.  I mean, there's no question in his mind

22   about that.  And, in fact, Facebook did not --

23        THE COURT:  His recollection is quite

24   clear about the contract and its terms and

25   conditions and its purpose and objectives relating

1    to coding, delivery of program, software to carry

2    out Mr. Ceglia's specifications for the Street

3    Search software?

4            MR. SNYDER: Crystal clear.

5            THE COURT: Crystal clear. And he was

6    getting money for it, and -- but -- and he signed

7    it, but he doesn't recall whether he ever obtained

8    a copy, was given a copy by Mr. Ceglia at that

9    time.

10           MR. SNYDER: Whether -- he may have been

11   given a copy, but he certainly doesn't have one

12   today anymore than he has many of his belongings.

13           THE COURT: That's what I'm asking. Does

14   he recall getting a copy?

15           MR. SNYDER: He does not recall getting a

16   copy, although he may have gotten a copy.

17           THE COURT: I see.

18           MR. SNYDER: And the point here, your

19   Honor --

20           THE COURT: And he didn't search his

21   records in connection with the lawsuit to see if

22   it's --

23           MR. SNYDER: We do not have a copy --

24           THE COURT: -- maybe in his parent's attic

25   somewhere in some box, you know --

28

1           MR. SNYDER:  Your Honor, if we --

2           THE COURT:  -- versus --

3           MR. SNYDER:  If he only knew when he was

4    18 that he was going to go on to found Facebook

5    turned into a big company, and that eight years

6    later some man would sue him, he probably would

7    have saved the contract.  But like most 18-year-old

8    kids, packing up their boxes, moving from one place

9    to another, many of his possessions, personal and

10   otherwise, destroyed, left behind.  And this was no

11   more important than any other meaningless piece of

12   paper at the time.  In fact, he hadn't gotten paid,

13   gave up on getting paid, so the piece of paper, the

14   authentic contract, the StreetFax contract wasn't

15   worth the paper it was written on at that time.

16     So, we have established prima facie evidence,

17   your Honor, that expedited targeted discovery is

18   necessary.

19           THE COURT:  Well, can we focus on that for

20   a second?

21           MR. SNYDER:  Sure.

22           THE COURT:  Where would we end up if we

23   had targeted expedited discovery focusing on the

24   authenticity issue?

25           MR. SNYDER:  In the event, your Honor --

1           THE COURT:   Procedurally.

2           MR. SNYDER:   Yes, your Honor.   What we

3    would propose is a 30-day period, 30 days after the

4    production of what we say are the instruments of

5    the fraud, which we've delineated in our motion,

6    within 30 days we would conduct all the testing.

7           THE COURT:   I'll get to that.   That's the

8    protocol I think.

9           MR. SNYDER:   Yes.

10          THE COURT:   I want to talk about that.

11   What I'm asking is, is the objective here to

12   persuade the plaintiff that he is a liar and a

13   fraud artist, and his lawyers and get them to

14   basically throw the towel in?

15          MR. SNYDER:   I can't get inside the head

16   of this plaintiff because he appears --

17          THE COURT:   That's my point, what is

18   the --

19          MR. SNYDER:   My objective is to obtain

20   evidence, which we would then present to this Court

21   in support of a motion to dismiss the complaint on

22   the grounds that the plaintiff is committing, has

23   committed and intends to commit a fraud on this

24   Court.   And the case law is clear that under this

25   Court's inherent power, there is no more

1    appropriate reason to dismiss a complaint than --

2           THE COURT:  See, that's not in your

3    papers, that's why I asked the question.  I'm

4    having difficulty understanding where we are going

5    procedurally.  Because from all the plaintiff has

6    put in, it sure looks like they have no intention

7    of throwing the towel in, that their experts are

8    quite competent, if not equally competent or even

9    more competent than your experts, and that it would

10   be -- and that's why I'm asking this question.  It

11   would be a surprise to me if -- if as a result of

12   all the testing that you would accomplish -- and

13   I'm not saying I'm not going to allow you to do it

14   here, I'm just trying to understand what is it I'm

15   signing up for.

16          MR. SNYDER:  That's --

17          THE COURT:  What is it that I'm signing up

18   on behalf of Judge Arcara for?

19          MR. SNYDER:  I think --

20          THE COURT:  If I could finish.  And that

21   is, does it position you then to make a motion for

22   partial summary judgment?  I mean, how -- how does

23   it stop the case -- how does it stop the case

24   unless they concede as a result of the destructive

25   testing and otherwise that the -- that Mr. Ceglia's

1    got either a very bad recollection, or all of the

2    nasty things that you attribute to him are true, in

3    which case, there are two sworn affidavits here,

4    and who knows what the U.S. attorney might be

5    thinking about with these affidavits.

6       So what I'm getting at is, if it turns out that

7    the plaintiff's experts, after concomitant testing,

8    using the same protocols, come to a completely

9    different conclusion, even under inherent power,

10   which is the first time I've heard that that's your

11   strategy here procedurally, how does the case

12   terminate?  The case seems to me to go forward to

13   jury trial.

14          MR. SNYDER:  I think that that's the right

15   question, and if I may respond?

16          THE COURT:  Thank you.

17          MR. SNYDER:  Thank you.  First

18   preliminarily, I respectfully disagree that the

19   experts who submitted declarations on behalf of the

20   plaintiff endorse or attest to under oath the

21   authenticity of either the emails or the contract.

22   What they do is they make observations about that

23   evidence.  But none attest to the authenticity.  In

24   fact, it's the opposite.  Again, they -- the expert

25   who submitted a declaration concerning the emails

1    said I understand these are emails, and all he said

2    was documents, which I understand are emails --

3            THE COURT:  Concentrate on the contract.

4            MR. SNYDER:  And on the contract there was

5    no testimony given by the experts that this was an

6    authentic contract, that it was a legitimate

7    contract, that they tested it in the ways that

8    document examiners need to test documents to

9    ascertain authenticity.

10            THE COURT:  What is your point?  You're

11   saying to me that, Judge, not to worry, when we get

12   through with this document and they get through

13   with the document, all the experts are going to be

14   in agreement it's a fraud.

15            MR. SNYDER:  That is our expectation.  And

16   in the event that we are able to establish that

17   based on this testing, we believe at that time this

18   Court would not only --

19            THE COURT:  In the event that you are able

20   to establish it?

21            MR. SNYDER:  Yes.

22            THE COURT:  No.  You say you will

23   establish it.

24            MR. SNYDER:  We expect to establish it.

25   Until the testing is done your Honor --

33

1           THE COURT:  You can't be sure.

2           MR. SNYDER:  I can't be sure.  Because the

3    testing is multi-facetted.  It's actually

4    fascinating --

5           THE COURT:  So is it possible that your

6    experts -- your experts would change direction and

7    say, look --

8           MR. SNYDER:  No.

9           THE COURT:  -- it is authentic.

10          MR. SNYDER:  It's impossible that my

11   experts will say that it's authentic.

12          THE COURT:  Because?

13          MR. SNYDER:  Because they've already

14   determined based on visual observation, Mr. Romano

15   has, and other evidence, that it's amateurish

16   forgery.  The question is --

17          THE COURT:  Why do they need to see it

18   through expedited discovery?

19          MR. SNYDER:  Because there are additional

20   tests that need to be conducted based on document

21   forensic examination protocols that are necessary

22   to fully confirm the conclusion based on visual

23   inspection that the document is a fraud.  For

24   example, there are tests that can be done

25   microscopically in terms of paper and toner.  There

1    are optical lights that can be used to see

2    differences in ink, paper, and opaqueness of the

3    pages.  There's ink extractions which don't hurt

4    the integrity of the document to sample and

5    identify whether the ink is the same on both pages

6    and how old it is.  There are differences in paper

7    fibers --

8               THE COURT:  I'm familiar with those

9    things.

10              MR. SNYDER:  -- and the like, your Honor.

11              THE COURT:  We had a case under my

12   criminal jurisdiction many years ago where we got

13   into these very same issues.

14              MR. SNYDER:  So there's no chance that any

15   of our experts will change their view.  The

16   question is the quality --

17              THE COURT:  There's no chance?

18              MR. SNYDER:  No chance.  The question is

19   quality and quantum of evidence that we would like

20   to present to this Court in support of a motion to

21   dismiss --

22              THE COURT:  Okay.

23              MR. SNYDER:  And the case law is clear

24   that even where a plaintiff raises --

25              THE COURT:  Under inherent authority?

35

1              MR. SNYDER:  Yes.

2              THE COURT:  I see.

3              MR. SNYDER:  Even where a plaintiff raises

4       his right hand and swears to something, if the

5       evidence on the other side confirms the existence

6       of a fraud --

7              THE COURT:  How does the court do that

8       then?  If there are conflicting expert opinions,

9       does the court conduct a bench trial, or is it a

10      jury trial, an advisory jury trial?  I've never

11      heard of such a thing.  This is a totally new

12      concept.  Inherent power I understand.  But in this

13      context, your papers don't elaborate, and that's

14      why I'm asking these questions.

15             MR. SNYDER:  Right.  We didn't --

16             THE COURT:  I don't want to sign up for

17      the proverbial marching up the mountain only to

18      have to march down again, even though I'm very

19      sensitive to all the concerns that are raised here.

20             MR. SNYDER:  Let me give the legal

21      framework and then some of the practical --

22             THE COURT:  Let's put it this way.  I want

23      to make sure that once we launch this in the way

24      that you're requesting, that we know exactly where

25      we're going procedurally.